*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO APRIL 8, 2019

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  1:17-cr-37-JL
            v.                  *  December 13, 2018
                                *  Morning Session
CHRISTOPHER CLOUGH              *  9:11 a.m.
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL DAY 3
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:

For the Government:        Charles L. Rombeau, AUSA
                           Seth R. Aframe, AUSA
                           United States Attorney's Office


For the Defendant:         Patrick J. Richard, Esq.
                           Richard Law Office

                           Robin Gagne, Esq.
                           Gagne Law Office



Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

```
 1                        I N D E X

 2

 3

 4   WITNESS:            Direct    Cross    Redirect    Recross

 5
     NATALIE BABICH         4        44       119        123
 6   (Continued)

 7

 8   BRIDGET HORAN         125       --

 9

10   KEVIN FLYNN          148       165       173        --

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           (Chambers conference off the record from

2   9:05 a.m. until 9:10 a.m.)

3                    P R O C E E D I N G S

4           THE CLERK:  The Court has before it for

5   consideration this morning day three of the jury trial

6   in criminal case 17-cr-37-01-JL, United States of

7   America versus Christopher Clough.

8           THE COURT:  All right.  A couple of things.

9           First of all, ladies and gentlemen of the

10  jury, welcome back to court.

11          Have any of you been exposed to any sort of

12  information about the case during the recess from the

13  media, the Internet, or any other source?

14          Have any of you conducted any sort of

15  independent investigation or inquiry into any matter

16  involving this case during the recess?

17          There being no affirmative answers, we will

18  proceed.

19          As you can see, there's an empty chair in the

20  jury box.  One of our jurors is ill.  So we will have --

21  that's why we pick 14 instead of 12, in case things like

22  this happen.  So we'll be proceeding without that juror.

23          Your obligations haven't changed.  Please pay

24  attention to the evidence and we'll continue with the

25  direct examination that we left off at the end of the

1    day.

2              Please proceed.

3              MR. ROMBEAU:  Thank you, your Honor.

4                  CONTINUED DIRECT EXAMINATION

5    BY MR. ROMBEAU:

6        Q.    Good morning, Natalie.  I want to pick up on

7    the topic of Mr. Clough's writing of SUBSYS.

8              Was he a substantial writer of the product?

9        A.    Yes, he was.

10       Q.    Okay.  Would the company circulate daily or

11   weekly sales numbers among you and the other sales

12   staff?

13       A.    Yes, there was emails that were sent to us.

14       Q.    And would those emails include a ranking of

15   the top prescribers nationwide?

16       A.    Yes, they usually sent that about once a week.

17       Q.    Would you see Mr. Clough's name on those

18   lists?

19       A.    Not in the beginning, but, yes, after he

20   started writing substantial amounts, he was on that

21   list, yes.

22       Q.    And so being on the list, does that mean he

23   was in the top ten nationwide?

24       A.    Yes.  He got up to the top ten, yes.

25       Q.    Did he even crack the top five at some point?

1      A.    Yes, he did.

2      Q.    You testified a bit yesterday how you, during

3  this time frame, also had speakers in Connecticut and

4  Rhode Island.  How did Mr. Clough's writing of SUBSYS

5  compare to those speakers?

6      A.    He wrote higher doses than those speakers.

7      Q.    And would he also write more scripts?

8      A.    Yes, he would.

9      Q.    Okay.  And so higher doses, I don't think

10  we've really touched on that topic yet.

11            Would he start every patient at the lowest

12  dose, a hundred?

13      A.    Not every patient, no.

14      Q.    Okay.  And how high could a dose of SUBSYS go?

15      A.    1,600.

16      Q.    Okay.  Did he put any patients on the highest

17  dose?

18      A.    Yes, he did.

19      Q.    And, again, how did this compare to the other

20  speakers you had writing for you in Connecticut and

21  Rhode Island?

22      A.    He had more patients on higher doses than the

23  other doctors.

24      Q.    A thing you said at the end of the day

25  yesterday I want to touch on briefly.

1          For each prescription, would -- would a

2   patient have to pay anything to get a prescription in

3   the ordinary course?

4       A.    The patient would have to pay a copay, but

5   since the company did the prior authorization for the

6   drug, usually the copay was covered through the

7   pharmacy, yes.

8       Q.    Okay.  So I want to break that out a little

9   bit because I'm sure everyone in this courtroom has had

10  a prescription drug filled at some point.

11      A.    Uh-huh.

12      Q.    When you say the company covered it, what does

13  that mean here?

14      A.    So the company would do the prior

15  authorization for the office so they didn't have to do

16  the paperwork because it was extensive.  And the

17  company, this IRC program, would call the insurance

18  company and they would explain the diagnosis, what

19  medications the patient's on, and say the absolute need

20  of why they need to be on SUBSYS.

21          And it was either approved or not approved.

22  If it was approved, they wouldn't have a copay; and if

23  it was denied, then we would do the letter of medical

24  necessity.

25      Q.    Okay.  And so in the instances where there is

1    a copay, is that typically money a patient is expected

2    to pay for a prescription?

3         A.   Yes, and the copay would be very small

4    compared to -- the drug is thousands of dollars.  The

5    copay would be $50.  It could -- it would just be a lot

6    less, if approved.

7         Q.   Okay.  And -- and -- but there was at least

8    still some copay, but who's paying for it in these

9    instances, as far as you know?

10        A.   It would end up being the patient paying for

11   the small -- for the copay, yes.

12        Q.   All right.  And would INSYS reimburse patients

13   or just waive the copay altogether?

14        A.   Sometimes they would waive the copay and then

15   sometimes they would not pay --

16        Q.   Okay.

17        A.   -- and the patient would pay.

18        Q.   And do you have any understanding as to why

19   INSYS would make sure that a patient didn't have to pay

20   anything for a prescription?

21        A.   Because the prescription was so expensive that

22   if they could get the product out and they just had to

23   pay a $50 copay, $50 was not -- they were making more

24   revenue from an insurance company paying for the script.

25        Q.   And so in those instances, INSYS just eats the

1    copay; is that --

2         A.   Yes.

3         Q.   Okay.  We talked a little bit about

4    commission -- the commission structure at the outset of

5    your testimony yesterday.

6              Did your working relationship with Mr. Clough

7    prove to be a lucrative one for you?

8         A.   It did, very much so.

9         Q.   And -- I believe in your testimony yesterday

10   in describing that structure you said that every script

11   generates -- every paid script generates money for the

12   company.  Is that how it worked?

13        A.   Yes.

14        Q.   And if money is generated for the company,

15   does that mean money is generated for you, Natalie?

16        A.   Yes.

17        Q.   What about for your bosses, like Mr. Roper or

18   Mr. Pearlman; do they get a take of any -- any

19   prescription that's approved?

20        A.   I don't know the percentage, but they do get a

21   percentage of commission off of myself and the reps that

22   they're supervising, yes.

23        Q.   And does every dosage increase also make you

24   and the company more money?

25        A.   Yes.

1    Q.   Over the year and a half you were at INSYS,

2 approximately how much did you make in commissions in

3 total?

4    A.   About 400,000.

5    Q.   And was Mr. Clough your -- let me you ask

6 this.

7         Do you have an idea as to how much of that was

8 attributable to the prescriptions written by Mr. Clough?

9    A.   It was a high percentage.

10    Q.   Was he your biggest writer during the 18

11 months you were at the company?

12    A.   Yes, he was.

13    Q.   And was second place close to him, your second

14 place writer --

15    A.   Not towards the end of -- not once he started

16 writing a lot, no.  He was -- there was no one close to

17 him.

18    Q.   Okay.  And so of that 400,000, is it your

19 understanding more than half is attributable to the

20 prescriptions he wrote?

21    A.   More than half, yes.

22    Q.   Okay.  I want to talk a little bit about the

23 scheduling of the speaking events with you.

24         How would you know how many events you were

25 allowed to schedule?

1    A.    There would be a conversation with my

2   supervisor, he would call me on the phone, and he would

3   allocate a certain number at the beginning of each

4   quarter about a month before the quarter so we could

5   book them for the quarter.  And he would say -- give me

6   a number based off of the volume of prescriptions that

7   were written per -- for each provider.

8    Q.    And did INSYS have a cap as to how many events

9   a speaker was allowed to have in a quarter?

10    A.    I don't believe so.

11    Q.    Okay.  And how would you then -- once you're

12   given the number from your supervisor -- go ahead and --

13   how'd you go about scheduling those events with

14   Mr. Clough?

15    A.    There was different quarters, so for an

16   example, one quarter I would go up to his office with my

17   calendar, he would have his calendar, and we would pick

18   the dates that worked off of him and myself around, you

19   know, my other speaking obligations and his personal

20   obligations.  So we would do it together, usually.

21    Q.    And then once you and Mr. Clough had this

22   meeting of minds about dates, what would you do then to

23   move those events forward?

24    A.    I would put them -- so everything was

25   generated through home office in Arizona.  So I would

1    put them into the computer and I would say January 1st

2    works at 6:00 p.m. and the computer -- I would send it

3    to home office and then they would send me back an

4    approval.

5        Q.   Okay.  And then as it's approved, would INSYS

6    send you an invitation ostensibly for inviting attendees

7    to come?

8        A.   Yes, they would send a -- for each specific

9    program there would be the date and the address and an

10   invitation emailed to us that I would print out, yes.

11       Q.   And would the folks in home office -- in the

12   home office typically send a confirmation email to

13   Mr. Clough also providing the details for the event?

14       A.   Yes.

15       Q.   And as part of that process, would they

16   provide him any sort of materials to be used at the

17   event?

18       A.   Yes, there was attachments to his emails.  I

19   wasn't copied on those emails, but he did have access to

20   the slide deck that he is supposed to use at the

21   dinners.

22       Q.   And we're going to get into a number of events

23   in a little bit, but before we do that, I just want to

24   ask -- so the event happens.  What was your

25   understanding of what had to be submitted after an event

1    in order for payment to be processed?

2         A.   What needed to be submitted afterwards was

3    many different things.  There had to be sign-in sheets

4    for all the attendees that were going to be there; then

5    there needed to be a receipt to prove that there was a

6    dinner that happened; and then there needed to be an

7    evaluation form of how the evening went.

8         Q.   And as the sales rep, was that typically your

9    responsibility to gather those materials and submit to

10   the home office?

11        A.   Yes, it was.

12        Q.   At some point in the time period Mr. Clough

13   was a speaker for you, did INSYS outsource the sort of

14   management of the speaker program to another company?

15        A.   Yes.  First it was home office and then

16   another company, I believe it was called Plan 365.

17        Q.   And did that -- did that really impact at all

18   what you needed to submit or how this whole system

19   worked?

20        A.   Yes, it did.  It actually had to be a little

21   more buttoned up.  So receipts -- on the top of the

22   receipt if there was a guest count, that had to match

23   the sign-in sheets.  So if there was five guests, there

24   had to be five signatures.

25        Q.   Why don't we get into some of the specific

```
 1   events.
 2              Could we pull up Exhibit 200, please,
 3   Ms. Blanco, and just zoom in on the top third or so of
 4   the page.
 5              Do you see what's on the screen in front of
 6   you, Ms. Levine, or Ms. Babich, excuse me?
 7        A.   Yes.
 8        Q.   Was there a speaking event scheduled for
 9   November 14th, 2013, with Mr. Clough?
10        A.   Yes.
11        Q.   And where was this scheduled to take place?
12        A.   It says Ristorante Massimo.
13        Q.   All right.
14        A.   In Portsmouth.
15        Q.   And where was that located?  Was that in --
16        A.   In Portsmouth.
17        Q.   In Portsmouth.  Okay.
18             Do you remember who picked this restaurant?
19        A.   He did.
20             MR. ROMBEAU:  Okay.  Could we just pull up 206
21   briefly?
22        Q.   Do you recognize this?  What are we looking at
23   here in 206?
24        A.   Yes, I do.
25        Q.   And what is it?
```

1      A.    The restaurant that we went to --

2      Q.    Okay.

3      A.    -- that night.

4      Q.    Did this turn out to be a sham event on

5   November 14th, Natalie?

6      A.    Yes, it was.

7            MR. ROMBEAU:  Could we pull up 20 -- 201,

8   please.  Just do the top half.

9            Yes, thank you.

10      Q.    A few moments ago you mentioned that the

11   confirmation emails that would go to Mr. Clough.  Is

12   this that confirmation email for that event?

13      A.    Yes, the Ristorante Massimo, yes.

14      Q.    And it looks like on the cc line you're copied

15   here.  Am I reading that correctly?

16      A.    Yes.

17      Q.    And the blue lines there, those would appear

18   to refer to a number of attachments, if I understand

19   that.  Are those what you're referring to in the

20   attachments that would be sent to Mr. Clough?

21      A.    Correct, yes.

22      Q.    Okay.  Could we go to -- we'll just take a

23   quick look at the attachments on this one.  I think it's

24   page 2 of this exhibit.

25            The -- I'll just focus on the first page here.

1   Is this what all of Mr. Clough's events were titled,

2   Advancements in the Treatment of Breakthrough Pain in

3   Cancer Patients?  Is that what the nominal event title

4   was for these events?

5        A.   Yes, it was.

6        Q.   And is this the -- the slide deck that would

7   be provided in advance?  And I realize it would change a

8   little bit over time, but that would be provided to

9   Mr. Clough for use?

10       A.   Yes, it was multiple pages.

11       Q.   In fact, it's more than 20 pages, isn't it?

12       A.   Yes.

13       Q.   And did you ever see Mr. Clough use this slide

14  deck at any of the events you did with him?

15       A.   We did not.

16       Q.   Okay.  Was there any presentation at all at

17  this particular dinner on November 14th?

18       A.   No, there was not.

19            MR. ROMBEAU:  Okay.  Let's pull up 203,

20  please.

21       Q.   Take a look at what's on the screen in front

22  of you.  What are we looking at here, Natalie?

23       A.   That's the evaluation form that an INSYS

24  employee needs to fill out after the dinner.

25       Q.   Okay.  And the -- on the top, the top portion

1    of it refers to total number of attendees.  What does it

2    say here?

3         A.    Total number of attendees is 3.

4         Q.    Okay.  And is that accurate?

5         A.    No, it was not.

6         Q.    Okay.  Was there -- what actually happened at

7    this dinner, if you remember?

8         A.    Chris was at that dinner and I was at that

9    dinner and we sat down, we filled out all the paperwork,

10   which I always did in the beginning, and then we sat

11   down and we had dinner together and there was no slide

12   deck.

13        Q.    And so this -- this review -- so are these --

14   is 5 the highest score you were allowed to give?

15        A.    Yes.

16        Q.    So this was a perfect score for Mr. Clough, if

17   I see that correctly?

18        A.    Correct.

19        Q.    Okay.  But was there any presentation at all?

20        A.    There was no presentation.

21        Q.    Where would you get the -- the information

22   that you would put on a form like this?

23        A.    It was just various different topics that we

24   talked about on weekly sales calls of things that were

25   brought up.  So they were all just literally hot topics

1    from weekly sales calls that I would just use to put

2    onto the form.

3          Q.   And this is probably an obvious question to

4    you at this point, but just to make sure the record's

5    clear, what's the purpose of submitting or preparing a

6    form like this with all fake information?

7          A.   To fax over to the company after the dinner to

8    prove that the dinner happened in order for Chris to get

9    paid.

10         Q.   Okay.  Would INSYS approve payment if it knew

11   that this dinner was just you and Mr. Clough?

12         A.   No.

13              MR. ROMBEAU:  So the -- we can pull up 202,

14   please.

15         Q.   So what was the solution then?  This is a

16   dinner of just you and Mr. Clough.  What's the solution?

17         A.   The solution was to forge names and signatures

18   of people that were not there.

19         Q.   Okay.  And for this event on November 14th, do

20   you recognize what's in front of you here?

21         A.   That's the program sign-in sheet, yes.

22         Q.   Okay.  And I see an entry for Mr. Clough and

23   below that, what's the name below Mr. Clough there?

24         A.   It looks like it says Steve Toscano, but

25   that's just not my handwriting.

1      Q.    Okay.  Do you know who Steve Toscano is?

2      A.    No, I do not.

3      Q.    Okay.  Do you -- how did you get his name for

4  this sign-in sheet?

5      A.    Chris -- when we would sit down for the

6  dinners, I would say who would you like to sign in

7  tonight because there needs to be another person other

8  than just me or you, it has to be, you know, a

9  healthcare professional, and he would pick the name.

10     Q.    And for this -- this entry for Mr. Toscano,

11 there's something listed as an NPI.  Do you know what an

12 NPI is?

13     A.    So I don't really know what an NPI is, but I

14 do know that every provider has one.  It must go with

15 their license or their prescribing ability.  So I would

16 just -- you can just Google NPI for Steve Toscano and it

17 just pops up on Google.

18     Q.    Okay.  And is -- is that what you remember

19 doing here in order to fill that in?

20     A.    Yes.

21     Q.    Okay.  Who signed Mr. Toscano's name on this

22 form?

23     A.    Chris signed his name.

24     Q.    Did he push back at all on this?  I mean, he's

25 signing someone in who's not there.  Did he have any

1  pause?

2      A.   No, he never had a concern about that.

3      Q.   And would this happen repeatedly over the

4  course of your events?  And we're going to talk about a

5  few more over the course of this morning, but would this

6  happen repeatedly?

7      A.   It happened repeatedly, yes.

8           MR. ROMBEAU:  Could we pull up 204, please.

9      Q.   Is this the -- the receipt from the dinner

10  that night?

11      A.   Yes.

12      Q.   I note at the top of this one it says, guests,

13  2.  Was that an accurate reflection of how many people

14  were actually at this event, you and Mr. Clough, the two

15  of you?

16      A.   It was the two of us, yes.

17           MR. ROMBEAU:  Okay.  Can you pull up Exhibit

18  300, Ms. Blanco.

19      Q.   Did you schedule a dinner with Mr. Clough for

20  November 19th, just this next week, after the event we

21  talked about, at Brazo?

22      A.   Yes.

23           MR. ROMBEAU:  Okay.  Could we pull up 306.

24      Q.   Do you recognize 306 as the --

25      A.   I do.

1     Q.   I'm sorry to talk --

2     A.   Sorry.

3     Q.   Is that the restaurant?

4     A.   Yes, it is.

5     Q.   Do you remember who picked this one?

6     A.   I believe I did.

7     Q.   Were you generally familiar with the

8  restaurants in the Portsmouth area?

9     A.   Yes.  I went to the University of

10 New Hampshire.

11         MR. ROMBEAU:  Could we pull up 301, please.

12     Q.   Is this the confirmation email that went to

13 Mr. Clough in advance of that event at -- on November

14 19th?

15     A.   Yes.

16     Q.   And I won't go through the attachments again,

17 but does this email appear to include those -- the

18 attachments and the slide shows?

19     A.   It does.

20     Q.   Okay.  Was this event on November 19th a sham

21 event?

22     A.   It was a sham event.

23     Q.   Okay.  Was there any presentation?

24     A.   No, there was not.

25     Q.   Who was actually there, if you remember?

1       A.   Chris and I.

2            MR. ROMBEAU:  Can we pull up 303, please.

3       Q.   Do you recognize what we're looking at here?

4       A.   Yes.  It is the evaluation form that the INSYS

5  staff needs to fill out, myself.

6       Q.   And, again, I'm sorry.  You said 5 is the

7  highest score Mr. --

8       A.   Yes.

9       Q.   And so a perfect score again for Mr. Clough?

10      A.   Yes, it was a perfect score.

11      Q.   And this notes that there were three attendees

12  at the event.  Is that accurate?

13      A.   It is not accurate.  There was only the two of

14  us, him and I.

15           MR. ROMBEAU:  Could we pull up 302, please.

16      Q.   Is this the sign-in sheet that was submitted

17  in connection with that event?

18      A.   Yes.

19      Q.   Below Mr. Clough's name, do you -- can you

20  read what that name says?

21      A.   It says Kasey Talon underneath his name.

22      Q.   Okay.  Do you know who Kasey Talon is?

23      A.   She, at the time, was another provider in his

24  office.

25      Q.   Was she at this event that night?

1       A.    She was not at the event.

2       Q.    And how did -- how did her name get on this

3  sign-in sheet?

4       A.    When we first got to the restaurant, I would

5  ask Chris who he wants to sign in because there was no

6  attendees and he would pick the name and I would fill

7  out all the information and then he would do the

8  signatures.

9       Q.    And is that how you remember it happening on

10 November 19th at Brazo?

11      A.    Yes.

12      Q.    And was this -- was this dinner then -- I'm

13 sorry if you said this -- just you and Mr. Clough?

14      A.    Yes, it --

15      Q.    Okay.

16      A.    -- was.  Yes, it was.

17            MR. ROMBEAU:  Could we pull up 304, please.

18      Q.    Take a moment to look at this.  Is this the

19 receipt from that dinner on November 19th?

20      A.    Yes.

21      Q.    And, again, this one right under where it says

22 Brazo in big letters, it says COV, or cover, two.  Does

23 that accurately reflect that it was just the two of you

24 that night?

25      A.    Yes.

1           MR. ROMBEAU:  Can we pull up Exhibit 400,

2  please.

3      Q.   Did you schedule a dinner with Mr. Clough for

4  January 13th, 2014, in Boston?

5      A.   I did, yes.

6      Q.   Okay.  Is this the -- the invitation that

7  INSYS prepared for you to circulate in connection with

8  that event?

9      A.   Yes.

10          MR. ROMBEAU:  All right.  Could we go to 406,

11  please.

12     Q.   Do you recognize what's in front of you at

13  406?

14     A.   The Met Bar, yes.

15     Q.   Okay.  Is that where the event was that night?

16     A.   Yes.

17     Q.   Do you remember who picked this location?

18     A.   I picked it.

19     Q.   Okay.  Was there any particular reason you

20  wanted to do one in Boston?

21     A.   Yes.  I lived in Boston at the time and I

22  was spending so much time driving in the car.  And I

23  thought -- and Chris was very willing to drive down to

24  Boston to go to the dinner, so we -- I picked it in

25  Boston.  And it was also part of my territory, so it was

24

1   fine to have it in the city.

2        Q.   Did this event on January 13th, 2014, was that

3   also a sham event?

4        A.   It was, yes.

5             MR. ROMBEAU:  Could we pull up 401, please.

6        Q.   Is this the confirmation email that went to

7   Mr. Clough in advance of that event, attaching the

8   materials?

9        A.   Yes.

10            MR. ROMBEAU:  Okay.  Go to 402, please.

11       Q.   Take a moment to look at this, Natalie.  Do

12   you recognize what we're looking at here?

13       A.   I do, yes.  It is the sign-in sheet.

14       Q.   Okay.  And -- for that event on January 13th?

15       A.   Yes.

16       Q.   Who are Leah Clough and Pam March?

17       A.   Leah was Chris's wife at the time and Pam was

18   his medical assistant.  I think that was her title.

19       Q.   Were either of them at this event at the Met

20   Back Bay in Boston?

21       A.   They were not there, no.

22       Q.   Do you know how their names were volunteered

23   for this sign-in sheet?

24       A.   Again, I would ask Chris who he wants to put

25   on the piece of paper and he would pick the names.

1          MR. ROMBEAU:  Could we pull up 404, please.

2     Q.    Again, a perfect score for that evening.  Did

3  that reflect any actual presentation given?

4     A.    There was no presentation given.

5     Q.    And your note here talking about how important

6  patient selection is and abuse, was there any actual

7  discussion of topics like that that night?

8     A.    No, there was not.

9          MR. ROMBEAU:  Okay.  Could we pull up 405.

10    Q.    Is this the receipt from dinner that night?

11    A.    Yes, it is.

12    Q.    I -- I note there's a filet mignon on there.

13  Do you remember who ate the filet that night?

14    A.    I do not remember.

15          MR. ROMBEAU:  Can we go to Exhibit 500 please.

16    Q.    Did you schedule a dinner with Mr. Clough for

17  February 19th, 2014, at the Black Trumpet wine bar in

18  Portsmouth?

19    A.    Yes, I did.

20          MR. ROMBEAU:  Could we pull up 508.

21    Q.    Do you recognize what we're looking at here in

22  508?

23    A.    Yes, the restaurant that we had dinner at,

24  yes.

25    Q.    Do you remember who picked this event or,

1  excuse me, picked this location?

2      A.    I don't remember who picked this location, but

3  I knew it was in Portsmouth.

4          MR. ROMBEAU:  Could we go to 501, please.

5      Q.    Is this the confirmation email that went to

6  Mr. Clough that night?  For that night, excuse me.

7      A.    Yes.

8      Q.    Was this another sham event?

9      A.    Yes, it was.

10     Q.    Was there any presentation at all?

11     A.    There was no presentation.

12     Q.    Do you remember who was actually at this

13 event?

14     A.    Just the two of us.

15         MR. ROMBEAU:  Okay.  Could we have the -- the

16 evaluation form for this one?  502, I think it is.

17     Q.    Is what's in front of you that's been marked

18 as 502, is that the evaluation form for that dinner that

19 night?

20     A.    Yes, it is.

21     Q.    Okay.  And, again, where it notes that there

22 are three attendees, is that accurate?

23     A.    It is not accurate.

24     Q.    Okay.  Again, it reflects a perfect score for

25 Mr. Clough and the first of many issues being raised.

1    All that information is inaccurate; is that correct?

2         A.    Correct.

3              MR. ROMBEAU:  Can we go to 503, please.

4         Q.    So at this point had the company changed the

5    sign-in sheet process from sort of a multi sign-in to a

6    single sign-in?

7         A.    Yes, it did.

8         Q.    Okay.  And is this the sign-in sheet for you

9    that night at Black Trumpet?

10        A.    Yes.

11             MR. ROMBEAU:  Can we go to 504, please.

12        Q.    What are we looking at here at 504, Natalie?

13        A.    The sign-in sheet for Black Trumpet and

14   Chris's sign-in.

15             MR. ROMBEAU:  Okay.  And 505, please.

16        Q.    What are we looking at here?

17        A.    The third fake attendee, Leah Clough.

18        Q.    Okay.  Was -- was Leah Clough at this event?

19        A.    No, she was not.

20        Q.    And who offered her name as a putative

21   attendee for this event?

22        A.    Chris picked the name.

23        Q.    Did he sign for her that night?

24        A.    Yes, he did.

25             MR. ROMBEAU:  Can we pull up 506, please.

1    Zoom in a little bit.

2         Q.    Is this the receipt for the dinner that night?

3         A.    Yes.

4         Q.    Okay.  And I'll note it says GST-2.  Does that

5    accurately reflect it was just the two of you there that

6    night?

7         A.    Yes, it does.

8               MR. ROMBEAU:  Okay.  Can we go to Exhibit 600,

9    please.

10        Q.    Was there a dinner scheduled with Mr. Clough

11   for March 11th, 2014, at Stella in Boston?

12        A.    Yes.

13        Q.    Okay.  And what we have in front of you as

14   600, is this the confirmation email for Mr. Clough that

15   night?

16        A.    Yes.

17        Q.    Do you remember if there was an invitation

18   that was prepared for this night?

19        A.    There was a -- yes, there was an invitation.

20               MR. ROMBEAU:  Okay.  And could we pull up 606,

21   please.  I'm sorry, I meant the picture.  Is it 607?

22   Yeah, 607.  My apologies.

23        Q.    What are we looking at here in 607?

24        A.    A picture of the restaurant from the outside.

25        Q.    Okay.  Do you remember who picked Stella?

1       A.    I did.

2       Q.    Okay.  Was this another sham event?

3       A.    Yes, it was.

4             MR. ROMBEAU:  Okay.  Could we pull up 602,

5    please.

6       Q.    Is this Mr. Clough's sign-in from that event?

7       A.    Yes, it is.

8       Q.    And I should -- for all these events we're --

9    we've talked about Mr. Clough signing in, was he

10   actually there?

11      A.    He was actually there, yes.

12            MR. ROMBEAU:  Okay.  And 601, please.

13      Q.    Is this your sign-in from that night?

14      A.    Yes, it is.

15            MR. ROMBEAU:  Okay.  603, please.

16      Q.    What are we looking at here in 603?

17      A.    The sign-in form for the attendee, Leah

18   Clough.

19      Q.    Okay.  And was Ms. Clough actually at that

20   event?

21      A.    She was not at the event.

22      Q.    Okay.  How did you get the name Leah Clough

23   for the form at this event?

24      A.    I asked him who he would like to pick as the

25   other guest and he picked her name.

1          Q.    Okay.  And did Mr. Clough sign her name on

2    this form?

3          A.    Yes, he did.

4          Q.    Okay.  Do you remember whether there was a

5    third person with you and Mr. Clough this night at

6    Stella?

7          A.    I do not remember.  I had an assistant at some

8    point and she would come and have dinners with us and

9    she would be the third attendee.  So it's possible that

10   she was there, but if she wasn't, then it was just the

11   two of us.

12              MR. ROMBEAU:  Okay.  And could we go to 604,

13   please.

14         Q.    Is this the receipt for that dinner at Stella?

15         A.    Yes, it is.

16              MR. ROMBEAU:  Could we pull up -- I think it's

17   606.

18         Q.    Is this the evaluation for that dinner at

19   Stella on March 11th?

20         A.    Yes, it is.

21         Q.    Okay.  And, again, was there any actual

22   presentation for which you could give perfect scores to?

23         A.    No, there was no presentation.

24              MR. ROMBEAU:  Could we go to Exhibit 700,

25   please.

1        Q.   Did you schedule a dinner with Mr. Clough at

2   Surf in Portsmouth for July 28th, 2014?

3        A.   I did, yes.

4        Q.   Do you remember who picked Surf?

5        A.   I believe I did.

6             MR. ROMBEAU:  Okay.  Could we pull up Exhibit

7   710, please.

8        Q.   Is this the restaurant where the dinner took

9   place?

10       A.   Yes.

11       Q.   Was this another sham event?

12       A.   Yes, it was.

13            MR. ROMBEAU:  Could we pull up 701, please.

14       Q.   Is this the confirmation email that went to

15   Mr. Clough in advance of that event?

16       A.   Yes.

17            MR. ROMBEAU:  Let's do the sign-in sheets.

18            Exhibit 703, please.

19       Q.   Is this the sign-in sheet for you that night?

20       A.   Yes.

21            MR. ROMBEAU:  Okay.  And 704.

22       Q.   We're looking at Mr. Clough's sign-in sheet?

23       A.   Yes.

24            MR. ROMBEAU:  705, please.

25       Q.   I note this one is the name of Jessica Crane.

32

1   Is that the assistant you were referring to a few

2   moments ago?

3        A.   Yes, it was.  Yes, it is.

4        Q.   And it notes on here she's a -- her title is a

5   BRM.  Do you know what that was at INSYS?

6        A.   I do not.

7        Q.   Okay.

8        A.   Business relations manager -- I -- no, I --

9   no.

10       Q.   What was your official title while you were

11  there?

12       A.   A professional -- a specialty sales

13  professional, SSP.  I just -- we were sales reps.  That

14  was the term that we used.

15       Q.   A lot of corporate gobbledegook in your title?

16       A.   Yes.

17            MR. ROMBEAU:  Okay.  Let's go to 706, please.

18       Q.   Who is Tiffany Cole?

19       A.   I -- I don't know.

20       Q.   Okay.  Was she at this -- this event we've

21  been talking about at Surf on July 28th, 2014?

22       A.   No, she was not.

23            MR. ROMBEAU:  Can we go to 707.

24       Q.   Who is -- do you recognize the name on this,

25  this form, Shelley McGlone?  Who is that?

1    A.    I do recognize that person.  She worked in the

2   office.  She worked in Chris's office.

3    Q.    And do you recognize the handwriting where

4   Shelley McGlone is written?

5    A.    Yes, that's Chris's handwriting.

6          MR. ROMBEAU:  Okay.  Can we go to 702, please.

7    Q.    Is this the presentation -- excuse me -- the

8   evaluation form for that evening?

9    A.    Yes, it is the evaluation form.

10    Q.    Okay.  And is this -- is the information

11   contained on this form accurate?

12    A.    No, it is not.

13    Q.    Okay.  Again, perfect scores for a

14   presentation that Mr. Clough did not give; is that -- is

15   that correct?

16    A.    That is correct.

17          MR. ROMBEAU:  Could we pull up 708, please.

18    Q.    Is this the receipt for the dinner that night?

19    A.    It is, yes.

20    Q.    And I note this one refers to five guests and

21   appears to involve a -- a fair amount of food.  Do you

22   remember who was actually at this event?

23    A.    Definitely Chris, myself, and my assistant and

24   I don't remember who else.

25    Q.    And I think we touched on this briefly

34

1    yesterday, but in some instances, would you invite

2    friends to attend?

3        A.    I would invite friends to attend, yes.

4             MR. ROMBEAU:  Okay.  Could we go to Exhibit

5    800, please.

6        Q.    Did you schedule a dinner with Mr. Clough at

7    Jumpin' Jay's in Portsmouth for August 18th, 2014?

8        A.    I did, yes.

9             MR. ROMBEAU:  Could we go to 811, please.

10       Q.    Is this the restaurant Jumpin' Jay's?

11       A.    Yes.

12       Q.    Was this another sham event?

13       A.    Yes, it was.

14            MR. ROMBEAU:  Okay.  Could we go to 801,

15   please.

16       Q.    Is this the confirmation email that was --

17   went to Mr. Clough in advance of that event?

18       A.    Yes.

19       Q.    Do you remember who was actually at this one?

20       A.    There was no other prescribers at this one and

21   I believe his kids joined us for this dinner.

22            MR. ROMBEAU:  Let's go to 803, please.

23       Q.    Is this your sign-in for that event at Jumpin'

24   Jay's?

25       A.    Yes, it is.

1          MR. ROMBEAU:  804, please.

2     Q.   Is this Mr. Clough's sign-in?

3     A.   Yes.

4          MR. ROMBEAU:  805.

5     Q.   What's the name on this sign-in sheet?

6     A.   Evan Dowdey.  Dowdey?  Dowdey.

7     Q.   Do you know who Mr. Dowdey is?

8     A.   I do not.

9     Q.   Was Mr. Dowdey at this event at Jumpin' Jay's?

10    A.   No, he was not.

11         MR. ROMBEAU:  806, please.

12    Q.   Who's this name on this sign-in?

13    A.   Susan Colby.

14    Q.   Do you know who that is?

15    A.   I do not.

16    Q.   Was she at this event?

17    A.   No, she was not.

18         MR. ROMBEAU:  807, please.

19    Q.   What's the name on this one?

20    A.   Nichole Wheeler.

21    Q.   Do you know who Nichole Wheeler is?

22    A.   Yes.  She worked -- she worked in Chris's

23 office.

24    Q.   And was Ms. Wheeler at this event?

25    A.   No, she was not.

1          MR. ROMBEAU:  808, please.

2      Q.   This one says Shelley McGlone we talked about

3  a minute ago.  Was Ms. McGlone at this event, if you

4  remember?

5      A.   She did come to one event.  I think that this

6  is the one that she came to.

7      Q.   Okay.  So for the names Dowdey, Colby, and

8  Wheeler, where did all those names come from for sign-in

9  sheets for that event?

10      A.   When we got to the restaurant, we always did

11  the paperwork first and I would ask Chris who he wants

12  to sign in and he would pick the names.

13      Q.   Why not just have his kids sign in if they're

14  there?

15      A.   Because they are not considered healthcare

16  professionals.

17          MR. ROMBEAU:  Can we go to 802, please.

18      Q.   Is this the sign-in sheet for that dinner on

19  August 18th -- excuse me -- the evaluation form for that

20  dinner on August 18th?

21      A.   Yes, it is.

22      Q.   So it appears he's finally slipped from

23  perfect scores for not getting presentations, right?  Is

24  there any reason he fell off here in your fake form?

25      A.   No reason.

1          MR. ROMBEAU:  Okay.  Can we go to 809, please.

2      Q.   And I'll mention this one just before we go to

3  page 2 of this.

4          Is this how you would often submit receipts

5  after events to Plan 365 during this time frame?

6      A.   Yes.

7      Q.   Okay.  And what's the date on this submission?

8      A.   8/19.

9      Q.   Okay.  And what's the subject line of your --

10  your email to them?

11      A.   Clough 8/18 documents.

12          MR. ROMBEAU:  Okay.  Can we go to page 2 of

13  this.

14      Q.   And I recognize this receipt doesn't reference

15  Jumpin' Jay's anywhere on it, but is this the receipt

16  you submitted in connection with that August 18th event?

17      A.   Yes, it is.

18      Q.   And in the middle of this the receipt reflects

19  kid's pasta with chicken.  Does that accurately reflect

20  your recollection that Mr. Clough's children were at

21  this event?

22      A.   Yes, his children were definitely at that

23  event.

24      Q.   Okay.  And so all this paperwork we've talked

25  about, this paper in the file, just to bring it back,

1  why is it that you are getting these sign-in sheets and

2  submitting them?

3      A.   So at the end of each dinner I would gather

4  all the things and fax them over to the company.  If the

5  company received all the paperwork that made it look

6  like it was a real dinner, then Chris would get paid.

7      Q.   So we've talked about seven events or so in

8  detail at this point where there were no presentations.

9  Were there many other dinners that we have not discussed

10 in detail that were -- proceeded in a similar manner as

11 the ones we've talked about today?

12     A.   Yes, there were.

13     Q.   Okay.  Do they all have similar fake

14 documentation to the ones we looked at?

15     A.   Yes.

16     Q.   And of all the dinners, how many times do you

17 estimate the defendant did an actual presentation about

18 the drug to actual other prescribers?

19     A.   None.

20     Q.   You did reference a dinner maybe in Cape Cod

21 yesterday.

22     A.   Yeah, there -- we had done some dinners with

23 other prescribers, but it wasn't a formal, in a private

24 room, with a slide deck on the screen and him standing

25 and going over each slide with -- it was more of a this

1   is what I prescribe, do you have any questions about it,

2   these are the kind of patients I prescribe it for, I

3   recommend it.  It was more of a question-and-answer with

4   other prescribers at the table.

5       Q.   And the events we've talked about in detail

6   here span from November 2013 to August 2014.  Was there

7   any real change in the type of events during that time

8   frame or was it all sort of consistently in this

9   fashion?

10      A.   It was -- in the beginning, I had tried very

11  hard to get attendees to come to the dinners.  And then

12  because it was not receptive with the providers in the

13  area, then it was just mostly him and I and my

14  assistant.

15      Q.   Okay.  So we've already talked a little bit

16  about that you were only at INSYS for about 18 months.

17  At some point did you make a decision to leave the

18  company?

19      A.   I did make a decision to leave the company

20  well before the 18-month time frame.

21      Q.   Okay.  And approximately when did you actually

22  end up leaving?

23      A.   At the end of the third quarter.  So that

24  would have been the fall of 2014.

25      Q.   So it sounds like it's a fairly lengthy time

1  period in which you're thinking about leaving.  Is that

2  fair to say?

3       A.   Yes.  I started thinking about leaving at the

4  beginning of 2014 when I hired Jessica.  I was hoping to

5  train her so she would take over.

6       Q.   Why did you want to leave?

7            MR. RICHARD:  Objection, relevance.

8            THE COURT:  I'd overrule it unless you want to

9  be heard at sidebar.  Is there anything you want to --

10           MR. RICHARD:  No.

11           THE COURT:  Overruled.

12      Q.   I'll repeat the question.  Why did you want to

13  leave INSYS?

14      A.   There was multiple reasons I wanted to leave

15  INSYS.  I knew that the speaker program was unethical

16  and it's something that I wasn't raised to do.  So I

17  kind of -- I knew that I just didn't want to be part of

18  that anymore.

19           The driving was extensive.  Having dinners

20  with Chris and myself was not enjoyable.  And at that

21  point I wasn't even making any money because I didn't

22  get paid for a while.  You don't get paid until about 45

23  to 60 days after the quarter ends.  So I never received

24  any of those big commission checks until pretty much the

25  summer of 2014.

1   Q.   The checks did come in, though, didn't they?

2   A.   They came in after I had decided that I wanted

3   to leave.  And I had met somebody that I wanted to

4   pursue a relationship and get married and have kids and

5   this is a kind of job that I wasn't able to do that.

6   Q.   All right.  So there were a lot of reasons you

7   mentioned there.  I want to spend a little time on

8   those.

9        You mentioned the speaking program was part of

10  this and that you didn't feel you were raised this way.

11  Did this stuff feel right to you as it was happening?

12  A.   In the beginning, I was trained by Abe

13  Rosenberg in Connecticut that it was okay.  The first

14  speaker program I went to in Connecticut, it was just

15  the provider and her significant other.  So I just did

16  what the other reps did.

17       But after a while, faking all these names and

18  forging this and it just -- it did not seem right, no.

19  It was not right.

20  Q.   And you mentioned the relationship that you

21  had.  Was this the relationship with your now husband?

22  A.   Yes.

23  Q.   Okay.  And during the course of 2014, are you

24  two long distance?

25  A.   Yeah, we're long distance across the country,

42

1  yes.
2       Q.   And that's because he worked out in Arizona?
3       A.   Yes, he did.
4       Q.   Okay.  And at the time you left INSYS in the
5  fall of 2014, is that when you moved out to Arizona?
6       A.   Yes.
7       Q.   Were you engaged by that point?
8       A.   Yes, I was engaged.
9       Q.   And so during this kind of multi-month
10  winding-down period or slowing-down period at INSYS,
11  were you in contact much with Mr. Clough?
12       A.   No.  Jessica pretty much had taken over the
13  majority of my contracts and she was attending dinners
14  and doing the paperwork and really just taking over.
15       Q.   Were you involved at all in his day-to-day
16  prescription writing at all during your last couple
17  months at the company?
18       A.   Very small amounts, just to help the patients
19  that needed the prescription.  I would assist with that.
20       Q.   And so after you leave INSYS and move to
21  Arizona, did you hear from Mr. Clough again?
22       A.   Yes, I did.  He --
23       Q.   Approximately how many times?
24       A.   About four or five text messages.
25       Q.   Okay.  Was it all via text message?

1          A.   Yes, it was.

2          Q.   Okay.  Tell us about that.  Why was he

3    reaching out to you?

4          A.   I don't know why he was reaching out to me.

5          Q.   Okay.  And what was he reaching out to you

6    about?

7          A.   There was four different -- four different

8    instances that I can remember.  One of them was

9    something like Merry Christmas if I don't see you, which

10   was in December, but I was already living in Arizona;

11   another one was about his golf tournament that was

12   coming up, that he could save a spot for me if I wanted

13   to play; another one was Mike Collins says hi --

14         Q.   And who is Mike Collins?

15         A.   Mike Collins was the Fentora rep.  So I felt

16   like that was just like a little bit of a dig.

17              And then another one way later in the summer

18   was something about did you know that Dr. Rosenberg got

19   reprimanded for using SUBSYS.

20         Q.   Okay.  So those contacts go into summer of

21   2015, if I heard you correctly?

22         A.   Yes.

23         Q.   Okay.  Did you write back to any of those

24   texts?

25         A.   None of them.

1       Q.    Okay.  You did mention something that I wanted

2   to follow up briefly on, a golf event.

3           Was Mr. Clough involved in any sort of regular

4   golf event that you knew of?

5       A.    The golf event that was for his mother's

6   foundation that he had started.  It was something he was

7   very passionate about because his mother had cancer and

8   so he had wanted to do a charity for cancer.

9       Q.    And in the year-plus that you were working

10  with him from INSYS, did you attend that golf event?

11      A.    I did attend that golf event with another

12  INSYS rep and my supervisor, Jonathan Roper, at the

13  time.

14      Q.    And did INSYS give any money to that event?

15      A.    Yes.  So I -- since it was a cancer event and

16  our drug was breakthrough and cancer pain, I had run it

17  by my supervisor saying that we should do a donation and

18  they said that that would be fine.

19      Q.    And was a donation, in fact, made?

20      A.    Yes, it was.

21          MR. ROMBEAU:  Nothing further, your Honor.

22          THE COURT:  Cross-examination.

23          MR. RICHARD:  Thank you.

24                    CROSS-EXAMINATION

25  BY MR. RICHARD:

```
 1        Q.    Good morning.

 2        A.    Hello.

 3        Q.    Your last name now is Babich, right?

 4        A.    It is.

 5        Q.    It is hyphenated Levine Babich or --

 6        A.    Levine is my middle name.

 7        Q.    Okay.  That's your middle name?

 8        A.    Yes.

 9        Q.    But that was your last name when you were a

10  sales rep?

11        A.    Yes, it was.

12        Q.    Okay.  Now you just said that you left INSYS

13  because you were uncomfortable with what was going on

14  with INSYS?

15        A.    Yes, I did.

16        Q.    Okay.  That you felt that the company was

17  unethical?

18        A.    I didn't feel like the company was unethical.

19  I felt like what I was doing in my position was

20  unethical.

21        Q.    Okay.  And, now, you had supervisors who were

22  telling you to act the way you were acting, correct?

23        A.    Yes, I did.

24        Q.    Okay.  And they had supervisors above them who

25  were telling them how to act as well?
```

46

1          A.   Yes.

2          Q.   Okay.  Now, you also left because you said you

3     found a man that you wanted to strike up a better

4     relationship with, correct?

5          A.   Correct.

6          Q.   Okay.  And what was his name?

7          A.   His name was Mike Babich.

8          Q.   Okay.  And what did he do for work at that

9     time?

10         A.   What did he do for work?

11         Q.   Yeah.

12         A.   He was the CEO of the company that I was

13    working for.

14         Q.   So he was the CEO of INSYS?

15         A.   Yes.

16         Q.   Okay.  He was in charge of everything that was

17    going on in the company?

18         A.   He was the CEO, yes.

19         Q.   Okay.  All right.  And so when did you get

20    married?

21         A.   In March 2015.

22         Q.   Okay.  Chris wasn't invited to the wedding,

23    right?

24         A.   He was not.

25         Q.   Okay.  Did you tell him you were getting

47

1    married?

2        A.    No.

3        Q.    Okay.  Did you tell people back in the Boston

4    area you were getting married?

5        A.    Yes.

6        Q.    Okay.  Was one of them Jessica Crane?

7        A.    Yes.

8        Q.    Okay.  Do you know if she told Chris you were

9    getting married?

10       A.    I have no idea.

11       Q.    Okay.  After -- well, you said you had contact

12   with him that summer, correct, that he sent something to

13   you about Mr. Rosenberg -- or Dr. Rosenberg?

14       A.    He said something to me, yes.

15       Q.    Okay.  All right.  And you didn't tell him at

16   that point that you got married?

17       A.    No.

18       Q.    Okay.  All right.  But after -- so once you

19   got married, you changed your name to Babich?

20       A.    Correct.

21       Q.    Okay.  Did you tell people back home you were

22   changing your name to Babich?

23       A.    I don't know if I told them -- I don't know if

24   I told people I was going to change my name.  I just

25   did.

48

1          Q.    Just did.  Okay.  All right.

2                Now, you said you went to college at UNH?

3          A.    I did, for four years.

4          Q.    Four years.  What did you study there?

5          A.    Counseling psychology.

6          Q.    Counseling psychology.  Is it a specialized

7    program or is it just a basic program?

8          A.    Sorry, that is incorrect.

9          Q.    Okay.

10         A.    I went undergrad for family studies --

11         Q.    Okay.

12         A.    -- and I went to Boston College for counseling

13   psychology.

14         Q.    Okay.  And at UNH, what year did you graduate?

15         A.    2006.

16         Q.    2006.  And did you directly go to -- you said

17   Boston College?

18         A.    I did.

19         Q.    Okay.  What year did you graduate from there?

20         A.    2008.

21         Q.    2008.  So did you go directly from college to

22   postgrad?

23         A.    Directly, yes.

24         Q.    Okay.  All right.  And you said you got a job

25   at a -- at a mental hospital?

1        A.    I did.

2        Q.    Where was that?

3        A.    In Brookline -- well, no.  I did my internship

4    in Jamaica Plain, got hired there, and then just was

5    transferred to the Brookline one.

6        Q.    Okay.  And the one in Jamaica Plain was a --

7        A.    The same exact thing.

8        Q.    -- mental hospital?  Okay.

9        A.    It was like CVS in one city, CVS in another

10   city.  Just went from one to the other.

11       Q.    All right.  Now, your education at UNH, did

12   that focus on psychology or was it just a basic

13   bachelor's degree program?

14       A.    It -- no, it focused on family studies, a

15   basic bachelor's program.  It wasn't psychology-based.

16       Q.    Okay.  But when you went to Boston College,

17   then you focused on psychology?

18       A.    Counseling psychology.

19       Q.    Counseling.

20       A.    Yeah.

21       Q.    Okay.

22       A.    Uh-huh.

23       Q.    All right.  And they taught you how to deal

24   with patients?

25       A.    Correct.

1      Q.   And deal with -- I guess if you were doing

2  counseling, you don't just have patients; you have kind

3  of clients, too?

4      A.   Yes.

5      Q.   Okay.  And it teaches in that program how to,

6  you know, find out what's wrong with them, correct?

7      A.   Yes, to help diagnose somebody, yes.

8      Q.   Okay.  And then how to help them deal with

9  what their issues are as well?

10     A.   Correct.

11     Q.   And they kind of teach you, I guess, sort of a

12  social worker approach?

13     A.   Yes.

14     Q.   Okay.  And that's basically being nice?

15     A.   Compassionate, yes.

16     Q.   Compassionate.

17          So at Boston College they taught you how to be

18  nice and compassionate to people?

19     A.   Yes.

20     Q.   To help them and make them feel better?

21     A.   Yes.

22     Q.   Okay.  Now, when you worked at the mental

23  hospital down in Brookline, you kind of honed your

24  skills there with that type of -- your social worker

25  skills?

1       A.   Yes.

2       Q.   Okay.  And for a while, you said, you found it

3  rewarding?

4       A.   Absolutely.

5       Q.   Okay.  And did you find it easy to help people

6  with problems calm down and --

7       A.   No, it was not easy.

8       Q.   No.  Okay.  You found it rewarding at first?

9       A.   Correct.

10       Q.   Okay.  But you were able to help people with

11  their mental problems?

12       A.   Yes.

13       Q.   Okay.  You couldn't cure them, obviously;

14  correct?

15       A.   Correct, right.

16       Q.   Right.  But you could help ease their -- their

17  situation?

18       A.   Yes.

19       Q.   Okay.  You described your manner with

20  Mr. Clough as a casual manner?

21       A.   Yes.

22       Q.   Is that something you developed at the --

23  while working with patients at the hospital?

24       A.   I kind of just think you are who you are as a

25  person and so I just have always been that way.

```
 1          Q.    Okay.  Sort of soft-spoken?

 2          A.    Just not yelling in somebody's face.

 3          Q.    Okay.  Well, that wouldn't have helped --

 4          A.    I don't know if I'm soft-spoken.  I don't

 5   think so, but --

 6          Q.    Okay.

 7          A.    -- just not aggressive.

 8          Q.    Okay.  All right.  We'll leave it at that.

 9                Now, obviously things went bad at the mental

10   hospital; correct?

11          A.    Yes, it did.

12          Q.    And you left?

13          A.    Correct.

14          Q.    And you were second choice for INSYS, but you

15   did take the job?

16          A.    I did.

17          Q.    Okay.  And you said there was a one-week home

18   training?

19          A.    One-week home training, yes.

20          Q.    Okay.  What did that consist of?

21          A.    It consisted of reading a chapter and taking a

22   test --

23          Q.    Okay.

24          A.    -- and then reviewing it with your supervisor,

25   reviewing the answers.
```

```
 1        Q.    What were the at-home study and tests about?

 2        A.    The drug, some science, a little bit about the

 3   company, the history of fentanyl.  Just many different

 4   topics.

 5        Q.    Okay.  Did it teach you about sales?

 6        A.    I -- I don't remember.

 7        Q.    Okay.  Did it teach you about the speaking

 8   program at all?

 9        A.    I don't remember.

10        Q.    Okay.  So the at-home stuff was pretty much

11   the basics?

12        A.    Yes.

13        Q.    Okay.

14        A.    More of the science, yes.

15        Q.    Okay.  So after you learned the basics, then

16   they sent you out to Arizona to learn more in a

17   classroom setting?

18        A.    Yes.

19        Q.    Okay.  And you said you spent a week out

20   there?

21        A.    I did.

22        Q.    Okay.  And there were 12 other reps --

23        A.    Yes.

24        Q.    -- or potential reps?

25        A.    Yup.
```

1      Q.    Okay.  And you said there was -- they taught

2  you about sales there?

3      A.    Yes.

4      Q.    Okay.  And they taught you about the speaker

5  programs that they had?

6      A.    They did.

7      Q.    How long did they spend on the speaker

8  programs?

9      A.    Less than a day.

10     Q.    Less than a day.  Maybe a half day?

11     A.    Sure.

12     Q.    Okay.  Sure?  Are you guessing or --

13     A.    Yeah, it wasn't more than a day.  It just -- I

14  don't know.

15     Q.    Okay.  But they spent time with you on speaker

16  programs?

17     A.    They did spend time with us on speaker

18  programs.

19     Q.    Okay.  And they let you know what was

20  appropriate for a speaker program?

21     A.    They did.

22     Q.    Okay.  Now, there was actually a legality

23  about how speaker programs should be run, correct?

24     A.    Yes, there is.

25     Q.    Okay.  Now, they should be -- have prescribers

55

1   in them, right?

2        A.   Yes.

3        Q.   Okay.  As attendees, I mean.

4        A.   Yes.

5        Q.   They should -- okay.

6             They need to discuss an educational program

7   regarding the drug?

8        A.   Yes.

9        Q.   Okay.  And there's -- does there have to be a

10  slide deck?

11       A.   Yes.

12       Q.   Okay.  And, lastly, where it's set up has to

13  be in a more private location, not a public part of a

14  restaurant, correct?

15       A.   Correct.

16       Q.   Okay.  So there would be -- should be like a

17  function room?

18       A.   Yeah, just like a private room that the doors

19  could close or there could be a curtain.

20       Q.   Okay.  And they taught you all of this at the

21  program?

22       A.   Yes.

23       Q.   Okay.  All right.  And did they tell you --

24  was this at the point where they're telling you to get

25  your one doctor or did that come later?  That was there?

1       A.    Not during the speaker program -- not during

2   the speaker presentation.

3       Q.    Okay.  That was some other time during the

4   training?

5       A.    During the sales presentation.

6       Q.    Sales presentation.  Okay.

7             And how long was the sales presentation?

8       A.    Little -- every -- all five days for little

9   bits --

10      Q.    Okay.

11      A.    -- a day.

12      Q.    Okay.  There was a little bit every day.

13  Okay.

14            And in that training, they pretty much were

15  telling you how to sell?

16      A.    Yes.

17      Q.    Okay.  And they taught you what tricks to use

18  to get a prescriber to like your product?

19      A.    Taught me which -- they just gave advice --

20  they gave advice on how to get your foot in the door and

21  how to switch the provider from one drug to another.

22      Q.    Okay.  And to get your foot in the door, you

23  had mentioned yesterday about bringing in food?

24      A.    Yes.

25      Q.    And that was one way; that was a way to get

57

1    past, I guess, the gatekeepers?

2         A.   It was.

3         Q.   Okay.  And you used that or at least you tried

4    to use that at first in --

5         A.   I used it all the time.

6         Q.   All the time?

7         A.   All the time.

8         Q.   Okay.  So you'd bring food in?

9         A.   All the time.

10        Q.   What kind of food would you bring?

11        A.   Different things, depending on what each

12   provider that I knew they liked.  Sometimes I would just

13   go to Trader Joe's --

14        Q.   Uh-huh.

15        A.   -- and grab 40 things, put it in a bag, and

16   just hand it off to Chris --

17        Q.   Okay.  All right.

18        A.   -- or somebody.

19        Q.   Okay.  All right.  Did you ever claim those as

20   an expense?

21        A.   Yes.

22        Q.   Okay.  And -- okay.

23             So also at this program they were teaching you

24   how to -- so, as you said, how to lure -- or I guess

25   that's probably not the right word -- how to get your

```
 1    provider, the prescriber, away from one drug to your

 2    drug?

 3         A.   Correct.

 4         Q.   In your case, it was usually trying to get

 5    them away from Fentora?

 6         A.   Fentora or Actiq.

 7         Q.   Actiq.  Okay.  All right.  And specifically

 8    they trained you on getting them away from those two

 9    drugs?

10         A.   From -- yes.

11         Q.   Okay.  And they basically taught you how to be

12    nice to everybody that was involved?

13         A.   I mean, they didn't teach us how to be nice.

14    They --

15         Q.   Okay.

16         A.   I mean ...

17         Q.   Did they advise you how to be nice?

18         A.   I don't think the word nice ever came up, to

19    be honest with you.

20         Q.   Okay.

21         A.   I think that they -- I mean, if you want

22    someone to buy something from you, you are just going to

23    be nice.

24         Q.   Okay.

25         A.   So it's just --
```

59

1      Q.    So, I guess, long and short of it, the

2  training was a training on how to make friends and

3  influence people?

4      A.    How to make friends and influence people, yes.

5      Q.    Okay.  And some of that was obviously, as we

6  discussed being nice, but to be -- be as friendly as

7  possible?

8      A.    Yes.

9      Q.    Okay.  And if you needed to, to flirt with

10 people, males?

11     A.    They never said if you need to flirt, you can,

12 but there was no -- just get it done.

13     Q.    Okay.  There was no telling you not to?

14     A.    There was no telling us not to.

15     Q.    Okay.  And when they -- regarding again --

16 regarding the speakers that they wanted you to find,

17 they wanted you to find somebody -- at the training,

18 they wanted you to find somebody that was passionate

19 about the drug?

20     A.    Yes.

21     Q.    Okay.  So you knew when you left there you

22 wanted to find somebody that really liked SUBSYS as a

23 prescriber?

24     A.    Yes.

25     Q.    Okay.  All right.  And you tried to go

1   everywhere once you got back here and, as you said,

2   doors got slammed in your face?

3          A.   Yes.

4          Q.   Okay.  Repeatedly?

5          A.   Yes.

6          Q.   And you asked for help?

7          A.   Yes.

8          Q.   Okay.  Did you get -- who'd you complain to,

9   Jeffrey Pearlman?

10         A.   Yes.  And my parents, yes.

11         Q.   And your parents.  Well, your parents couldn't

12   help.

13         A.   Why did I take this job.

14              Yes, I complained to everybody; I'm horrible

15   at this job.

16         Q.   Okay.  All right.  And how many months into it

17   were you before they had that sales awards banquet in

18   Arizona?

19         A.   A month.

20         Q.   A month.  Oh, so it was only a month into it,

21   into your sales work?

22         A.   Yes.  I went to Arizona two times in one

23   month.

24         Q.   Okay.  All right.  It was there where you said

25   you saw the top ten sellers getting awards?

1        A.    Yes.

2        Q.    Okay.  And this excited you, right?

3        A.    Absolutely.

4        Q.    You said it was -- did you say Abe Rosenberg

5   got a -- the big check?

6        A.    Yes, one of those big Publisher Clearinghouse

7   ones that don't fit in your car.

8        Q.    All right.

9        A.    Big check.

10       Q.    And you wanted one?

11       A.    Of course.

12       Q.    Okay.  And it was -- like you said, it was

13   more than -- almost as much as you made in a year?

14       A.    Yes, it was.  It was $30,000.

15       Q.    Okay.  I think yesterday you said, if others

16   can do it, so can I?

17       A.    Yes.

18       Q.    Okay.  So you started to want to adopt what

19   they were doing as your practice to be a salesperson?

20       A.    Adopt what they were -- I don't know if it was

21   adopt, but it was to work hard and get rewarded that

22   way.

23       Q.    Okay.  All right.  Now, again, your first area

24   was New Hampshire?

25       A.    No.  My territory was New Hampshire, Maine,

1    Vermont and part of Massachusetts.

2         Q.    Okay.  Which part of Massachusetts?

3         A.    Kind of like the Boston North Shore up to

4    New Hampshire.

5         Q.    Okay.  Did you get the Boston city itself?

6         A.    I did.

7         Q.    Okay.  All right.  And you tried doctors there

8    and had no luck?

9         A.    I had a little bit of luck.

10        Q.    Okay.  Some of -- you did get some

11   prescribers --

12        A.    I did.

13        Q.    -- later?

14        A.    I did.

15        Q.    Not when you first started?

16        A.    I got one -- I did get one prescriber -- one

17   prescription, one patient, from a Boston doctor --

18        Q.    Okay.

19        A.    -- in the beginning.

20        Q.    But that wasn't your first prescription?

21        A.    Yes, it was.

22        Q.    Oh, it was?  I thought your first prescription

23   was Dr. Greenspan.

24        A.    My first prescription in New Hampshire was

25   Dr. Greenspan.

1          Q.    Oh, okay.  All right.  So who was the first

2     doctor in Massachusetts then?

3          A.    Jeffrey Jackel.

4          Q.    Okay.  And he was out of Boston?

5          A.    Yes.

6          Q.    Okay.  And -- now, he was -- did you spend

7     time with him that first time he wrote a script for you?

8          A.    Dr. Jackel?

9          Q.    Yes.

10         A.    Yes.

11         Q.    Okay.  Why didn't you ask him to be a speaker?

12         A.    Why didn't I ask him -- I think I did,

13    actually.

14         Q.    Okay.  And he told you no?

15         A.    Yes.

16         Q.    Okay.  So you were still running with the

17    I-need-to-find-my-one-doctor at this point?

18         A.    Running fast, yeah.

19         Q.    Running fast.  Okay.  So any doctor that would

20    give you a script, you'd ask right away?

21         A.    Yes.

22         Q.    Okay.  Did you think that's how it was

23    supposed to go or was that just how you did it?

24         A.    I never saw a doctor ever, so when I saw one,

25    I knew this was my one shot to ask them.

1      Q.    Okay.

2      A.    So whenever I got a prescription written from

3  them, I asked them.

4      Q.    Okay.  All right.  So did you -- so your

5  first prescription then was with Dr. Jackel down in

6  Massachusetts?

7      A.    Yup.

8      Q.    And then at some point you needed some more

9  help, so was it Sonia helped you go up to New Hampshire?

10     A.    Sonia, yes.

11     Q.    Okay.  Where was -- what district was she

12  from?

13     A.    I think New York or New Jersey.  I don't

14  remember.

15     Q.    Okay.

16     A.    Somewhere over there.

17     Q.    All right.  And how long had she been

18  prescribing -- a sales rep, do you know?

19     A.    I do not.

20     Q.    Okay.  Was she as young as you?

21     A.    As young as me?

22     Q.    Around your same age?

23     A.    Yeah, around the same age.

24     Q.    Okay.  Had she been in sales before, did you

25  know?

```
 1         A.   I do not know.
 2         Q.   Okay.  But she went up to Dr. Greenspan's
 3    office up at PainCare?
 4         A.   She did.
 5         Q.   Okay.  Who drove, you or her?
 6         A.   Me.
 7         Q.   You did?  Okay.  And did she meet you in
 8    Boston?
 9         A.   Yes, she -- I think she flew to -- I don't
10    know.  Yeah.  I mean, she either drove to Boston or flew
11    to Boston.  I don't know.  But she met me in Boston, her
12    and I together in my car drove to New Hampshire.
13         Q.   Okay.  And you drove up to Somersworth?
14         A.   No.
15         Q.   Newington?
16         A.   Newington.
17         Q.   Newington.  And that's where -- there's a
18    PainCare office there?
19         A.   Yes.
20         Q.   And that's where you -- somehow she was able
21    to work it to see Dr. Greenspan?
22         A.   I did.  I called --
23         Q.   Okay.
24         A.   My supervisor said, you need help, I'm sending
25    someone more -- that has business to help you; please
```

1    set up appointments with doctors.  So lunch-and-learn is

2    what they're called.

3         Q.   Okay.

4         A.   So I set up three lunch-and-learns when she

5    came and she went to all three of them with me.  And one

6    of them was at Dr. Greenspan's office in Newington.

7         Q.   Okay.  So you had talked about a

8    lunch-and-learn yesterday and maybe I didn't understand

9    what they were.  What exactly is a lunch-and-learn?

10        A.   A lunch-and-learn is an opportunity for a

11   sales rep to schedule a lunch, pay for lunch and bring

12   it in during the lunch break of providers in the office,

13   have brochures, tell them about the drug, introduce a

14   new product as a sales rep during their lunch hour.

15        Q.   Okay.  And this is how you met Dr. Greenspan,

16   through one of these?

17        A.   Yes, it is.

18        Q.   Okay.  Do you remember where these

19   lunch-and-learns were when you first started with Sonia?

20   You said you had three.  Where were they?

21        A.   I remember only one other of where it was and

22   it was in the North Shore at a doctor's office.

23        Q.   Okay.  All right.  How many people at the

24   PainCare one that you went to?  It was in Newington,

25   right?

1          A.   Yes.

2          Q.   At that PainCare, how many -- do you remember

3    how many providers were there?

4          A.   In the Newington office, there was only one or

5    two providers really working there at a time.

6          Q.   Okay.

7          A.   And I know that Dr. Greenspan was definitely

8    there and I cannot remember if there was another one

9    there.

10         Q.   Okay.  And you did not meet Mr. Clough there,

11   correct?

12         A.   He was not there.

13         Q.   Okay.  Did Jeffrey Pearlman ever go to these

14   lunch-and-learns with you when -- at the beginning?

15         A.   Did he go to the lunch-and-learns?  He did

16   come and ride around with me in the beginning, yes.

17         Q.   Okay.  Did he go into these lunch-and-learns

18   with you?

19         A.   He might have come to one, but I don't

20   remember.  He got his face slammed in the door like I

21   did with me in the beginning.

22         Q.   Okay.  Okay.  All right.  Did you have later

23   lunch-and-learns afterwards, after you got your first

24   script from Mr. -- Dr. Greenspan?

25         A.   Did I have more?

1      Q.    Correct.

2      A.    Yeah, I had them for 18 months.

3      Q.    Okay.  So they were a regular thing?

4      A.    Oh, yeah.

5      Q.    Okay.  Now, sometimes these lunch-and-learns

6   would be -- they wouldn't be just you; sometimes it

7   would be -- your speaker would speak at them, correct?

8      A.    No.

9      Q.    Okay.  Sometimes you had lunches at PainCare,

10  correct?

11     A.    Yes.

12     Q.    While Mr. Clough was your speaker?

13     A.    Yes, so that was considered a speaking event.

14     Q.    Okay.

15     A.    Lunch-and-learns were an opportunity to get in

16  the door to --

17     Q.    Okay.

18     A.    -- educate.  The lunch-and-learns was for the

19  speaker to come to a lunch and speak.

20     Q.    Okay.  So you would not -- at these

21  lunch-and-learns, you would never have had your speaker

22  Mr. Clough there?

23     A.    Not at a lunch-and-learn, because a

24  lunch-and-learn is not a speaker program.

25     Q.    Okay.  All right.  Just so I know.

1          Now, after your lunch-and-learn with
2  Dr. Greenspan there at the PainCare in Newington --
3      A.   Yes.
4      Q.   -- he approached you and said he had a
5  patient?
6      A.   No.
7      Q.   Okay.
8      A.   He -- we went to his private office --
9      Q.   Okay.
10     A.   -- and at that time, Sonia -- I sat there like
11 a deer in headlights because I didn't know what I was
12 doing in sales.
13     Q.   Sure.
14     A.   She did all the talking.
15     Q.   Okay.
16     A.   I was just so happy to be sitting in front of
17 a doctor, I had no idea what she said, but all I know is
18 he said that he had a patient.
19     Q.   Okay.  You say private office.  Was it at the
20 PainCare clinic?
21     A.   Yes, like his particular desk, office, with
22 the door shut.
23     Q.   Okay.  All right.  So you were excited.  You
24 walked out of there and he said he was writing you a
25 script?

1          A.   Yes.

2          Q.   Okay.  Did you meet the patient that day?

3          A.   No, I did not.

4          Q.   Okay.  When did you meet the patient?

5          A.   I met the patient in the Somersworth office.

6          Q.   Okay.  So that was maybe how long -- how much

7    longer, later?

8          A.   Whenever -- so if the patient was given a

9    prescription, when his prescription ran out, he had a

10   second follow-up.  And it was for his second follow-up

11   of a prescription.

12         Q.   Okay.  And that was where you met Mr. Clough?

13         A.   Yes.

14         Q.   Okay.  You'd only met Dr. Greenspan one day?

15         A.   No, I could have done a lunch-and-learn before

16   Sonia was there and Dr. Greenspan --

17         Q.   Okay.

18         A.   -- could have come --

19         Q.   Sure.

20         A.   -- and grabbed a lunch, a sandwich, and took

21   off.  I don't --

22         Q.   Okay.

23         A.   I don't remember.

24         Q.   After he informed you he was going to write a

25   prescription --

1      A.    Uh-huh.

2      Q.    -- did you ever meet Dr. Greenspan again?

3      A.    No.  He no longer was at the practice.

4      Q.    Okay.  All right.  So the first --

5      A.    But I asked him to be a speaker.

6      Q.    You did?

7      A.    Uh-huh.

8      Q.    Okay.  And do I need to ask what he said?

9      A.    He said he would think about it.

10      Q.    Oh, he said he would think about it.  Okay.

11  Did you ever call on him again to try and get him to be

12  a speaker?

13      A.    Yeah, I did.

14      Q.    Okay.

15      A.    Of course.

16      Q.    All right.  And where did you go to do that?

17      A.    Back to his -- back to the office.  And then

18  he was no longer working there.

19      Q.    Okay.

20      A.    So ...

21      Q.    Did you try to find him?

22      A.    I didn't.

23      Q.    Okay.

24      A.    I didn't.

25      Q.    Okay.  Well, so the next -- when did -- you

1    first met the patient then in Somersworth?

2         A.    I did.

3         Q.    And this was Michael, you --

4         A.    Yes, his name was Michael.

5         Q.    -- said his name was Michael.  And you

6    remember him because it was your first script or first

7    one in New Hampshire?

8         A.    Absolutely.

9         Q.    Okay.  And he was very sick, you said?

10        A.    Yes, he was.

11        Q.    In his 20s?

12        A.    Yes, he was.

13        Q.    Okay.  And how much time did you spend with

14   Michael before you met Mr. Clough that day?

15        A.    Not long.  Five minutes.

16        Q.    Five minutes.  Okay.

17        A.    Like we were just in the patient room waiting

18   for him to come in.

19        Q.    How did you get into the patient room?

20        A.    The front desk people let me in.

21        Q.    Okay.  When you say patient -- so it was like

22   an exam room?

23        A.    Yeah.

24        Q.    Okay.  The one that has the -- the table with

25   the paper on it?

1       A.   Yes.

2       Q.   Okay.  So they just simply -- is that regular

3   practice, to let a sales rep into the -- into a room?

4       A.   I don't know.

5       Q.   Okay.  Now, you said they called -- yesterday

6   you said they called you.

7       A.   Yeah.

8       Q.   Okay.  And they said because you needed to

9   explain how the SUBSYS works to his -- to Michael's new

10  PA.

11      A.   I don't know if it was how SUBSYS works, but

12  it was the patient needs a refill --

13      Q.   Uh-huh.

14      A.   -- we don't know the process, the pharmacy

15  that you use, we don't know how to write the

16  prescriptions, we don't know anything about it, so can

17  you come up --

18      Q.   Okay.

19      A.   -- to assist us with that.

20      Q.   And at that point there was -- was it the IRC

21  program?

22      A.   Yeah.

23      Q.   And that was the preauthorization office in

24  Arizona?

25      A.   It was, yes.

1        Q.   Okay.  And so you knew that that office was in

2   existence and that they would help -- would you help

3   them help the patient get the medication?

4        A.   Can you repeat that?

5        Q.   You knew -- let me put that in a better way.

6             When they called you, you knew that you had

7   the prior authorization office to help you get that

8   patient the medication?

9        A.   Yes.

10        Q.   Okay.  And that they could do the paperwork,

11   essentially?

12        A.   No.  I did the paperwork.

13        Q.   You did all the paperwork?

14        A.   Yeah.

15        Q.   Okay.

16        A.   They're the ones who made the -- from the

17   paperwork that they received, they are the ones who

18   looked at my paperwork and made the phone call to the

19   insurance company.

20        Q.   Okay.  All right.  Now, so you met with

21   Michael in the Somersworth office in the exam room and

22   then at some point after five minutes, Dr. -- Mr. Clough

23   comes in?

24        A.   Yes.

25        Q.   Okay.  And did he seem put out that you were

1  there?

2      A.   No, he did not seem put out.

3      Q.   Did he know who you were?

4      A.   I don't know if he knew who I was.

5      Q.   Okay.

6      A.   I introduced myself.

7      Q.   Oh, okay.  All right.  And Michael and he

8  talked about SUBSYS, correct?

9      A.   Yes.

10      Q.   Okay.  And Michael explained to him what good

11  it had done for him?

12      A.   Yes.

13      Q.   Okay.  And Chris was starting to get excited

14  about it right away?

15      A.   I don't know if Chris got excited about it,

16  but if something helped the patient, he was going to --

17      Q.   Okay.  Okay.  How much time did he spend with

18  the patient that day, do you think, and you in the

19  treatment room?

20      A.   I don't know, but it wasn't super short, it

21  wasn't super long.

22      Q.   Okay.

23      A.   It just felt like a normal -- it -- I don't

24  know.

25      Q.   Okay.  All right.  But he -- when Michael

1   left -- did you stay in the exam room after Michael left

2   or did you walk out with Michael?

3          A.   I don't remember.

4          Q.   Okay.  But at some point Chris approaches you

5   before you left the office and asked you -- he wanted to

6   know about SUBSYS, correct?

7          A.   Can you repeat the question?

8          Q.   After the treatment with Michael --

9          A.   Yes.

10         Q.   -- Chris approached you that day and wanted to

11  learn more about SUBSYS?

12         A.   It just didn't happen like that.

13         Q.   Okay.

14         A.   So ...

15         Q.   Did he ask you to go to dinner with him that

16  night?

17         A.   I don't know.

18         Q.   Okay.  At some point that night, did you go to

19  dinner in Portland, Maine, with him?

20         A.   I have gone to dinner in Portland, Maine, with

21  him, but not that night.

22         Q.   Okay.

23         A.   I don't -- I don't know if it was that night.

24         Q.   Okay.  Was it soon thereafter then, possibly?

25         A.   Could have been.

1       Q.   Okay.  And you had relatives up in Maine?

2       A.   I do have relatives in Maine.

3       Q.   Okay.  But you don't recall this -- the exact

4 night, correct?

5       A.   I do not remember.

6       Q.   Okay.  All right.  But when you had dinner

7 with him in Portland, Maine, he wanted to know more

8 about SUBSYS?

9       A.   I don't think so.

10      Q.   No.  He wanted to know about you?

11      A.   Probably.

12      Q.   Okay.  But was there some discussion about,

13 obviously, your work?

14      A.   Yes.

15      Q.   Okay.  So that involved you talking about

16 SUBSYS?

17      A.   Yes.

18      Q.   Okay.  And you were trying to make a sale?

19      A.   For sure.

20      Q.   Okay.  So you would talk about the drug as

21 much as you could to try to sell that to him, right?

22      A.   Correct.

23      Q.   Okay.  But also talk about yourself and him to

24 keep him happy?

25      A.   I mean, when you go to dinners with somebody,

1    you talk about yourself; you -- they talk about

2    themselves.

3        Q.   Okay.  Right.  And sometime after you first

4    met Mr. Clough, you then got trained on dinners, on how

5    to do speaking dinners?

6        A.   Yes.

7        Q.   Okay.  And you said that was with Abe

8    Rosenberg?

9        A.   Yes.

10       Q.   And how soon after you first met Mr. Clough

11   did that training take place?

12       A.   I don't remember, but it was before -- before

13   Chris was a speaker.

14       Q.   Okay.

15       A.   I don't remember.

16       Q.   All right.  And is this something that INSYS

17   would do to train you when they knew you were going to

18   have a speaker?

19       A.   I don't know -- train me to --

20       Q.   Train you to know what these speaking programs

21   actually look like.

22       A.   Sorry.  Can you repeat the question?

23       Q.   Yeah.

24       A.   I'm a little confused.

25       Q.   Okay.

1      A.   Sorry.

2      Q.   Was it INSYS's policy to train you on --

3 further train you on speaker programs once you actually

4 got a speaker?

5      A.   Yes.  So your supervisor would -- your

6 supervisor would request, recommend, advise that you go

7 with another one of the sales reps to one of their

8 predetermined dinners to join them to see how it's --

9 how it's operated, how it goes --

10      Q.   Okay.

11      A.   -- so then you know how to do it when it's

12 your turn.

13      Q.   All right.  In Arizona you saw how they told

14 you in the classroom they go, right?

15      A.   Correct.

16      Q.   So this was now you seeing in reality how they

17 actually happen?

18      A.   Yes.

19      Q.   Okay.  So you went to a program in

20 Connecticut, you said?

21      A.   I did.

22      Q.   Or -- it was Connecticut?

23      A.   Yeah.

24      Q.   Okay.  And Heather Alfonso was the speaker?

25      A.   Yes.

1      Q.   Okay.  And you said she just had a friend

2  there with her?

3      A.   No, I said she had her significant other.

4      Q.   Oh, okay.  Okay.  And that was pretty much the

5  only other person that was there?

6      A.   There was four of us --

7      Q.   Okay.

8      A.   -- myself, Abe, Heather, and her significant

9  other.

10      Q.   Okay.  And that was it?

11      A.   That was it.

12      Q.   Was it in a public part of the restaurant or

13  was it in a private room?

14      A.   It was a public part of the restaurant.

15      Q.   Okay.  And you said there was drinks?

16      A.   Yes.

17      Q.   Okay.  And obviously food?

18      A.   Correct.

19      Q.   Okay.  And -- but was there any speaking about

20  SUBSYS at all?

21      A.   A slide deck, no, but speaking about SUBSYS,

22  yes.

23      Q.   Okay.  All right.  So the -- there was some

24  conversation about the drug?

25      A.   Yeah.

1      Q.   Okay.

2      A.   We all worked for the -- yes.

3      Q.   Sure.  Okay.  So is this how you -- when you

4   walked out of there, is this how you thought in reality

5   these are how these programs are supposed to go?

6      A.   I didn't know.  I was just like that was

7   weird, and then -- I thought to myself.  And then Abe

8   said, oh, you know, I tried to get some attendees, there

9   was no attendees, and that happens sometimes.

10     Q.   Okay.  And so you understood then at that

11  point that, I guess a better word, that happens

12  sometimes?

13     A.   Yeah.

14     Q.   Okay.  All right.  And you knew you wanted

15  your own speaker and you finally had one when Mr. Clough

16  agreed to speak?

17     A.   Correct.

18     Q.   Okay.  Now, you went back to your supervisor

19  and asked him if he could be -- a PA could be a speaker?

20     A.   Yes.

21     Q.   And you got the okay?

22     A.   Yes.

23     Q.   All right.  And were you surprised?

24     A.   I was just happy.  I don't think I was

25  surprised.  I think I was like, yes, great, yes, like

82

1    excited.  That's -- like not surprised, excited.

2         Q.   Now, did you start spending more time over at

3    PainCare then --

4         A.   Yes.

5         Q.   -- once he agreed?

6              Okay.  All right.  And how much were you

7    involved in getting Mr. Clough trained to be a speaker?

8         A.   It's really not my responsibility.

9         Q.   Okay.  You just sent in paperwork that --

10   requesting for him to be a speaker?

11        A.   Yes, but I told him that he need -- in order

12   to become a speaker, you need clinical experience, was

13   what the company would call it, meaning that you need

14   multiple patients on the prescription, multiple doses,

15   different -- different doses --

16        Q.   Uh-huh.

17        A.   -- so you have -- you could do a

18   question-and-answer if someone says, oh, my patient has

19   a stomachache, has this ever happened with one of your

20   SUBSYS patients.  They needed experience with the drug

21   to be able to be a speaker about it.

22        Q.   Okay.  All right.  And he had to attend a

23   training in Arizona, correct?  Initially required him

24   to?

25        A.   Yes.

1     Q.   Okay.  And that was a week-long speaking -- or
2  week-long training in --
3     A.   I think so, yeah.  I've never been, so I don't
4  know, but yeah.
5     Q.   That's so -- okay.  And he couldn't go,
6  correct?
7     A.   He could not go.
8     Q.   Okay.  And he couldn't go.  As you had
9  indicated yesterday, he had work reasons why he couldn't
10  go?
11     A.   Work reasons, kid reasons.  He just couldn't
12  go.
13     Q.   Okay.  And he had two kids?
14     A.   Yes.
15     Q.   Okay.  And he said he couldn't leave his kids
16  for that long?
17     A.   I don't know if he said, I couldn't leave my
18  kids for that long, but he said he couldn't go.
19     Q.   Okay.
20     A.   He had kids, he had work, he had life.
21     Q.   Okay.  Did you panic at that point?
22     A.   Yeah.
23     Q.   Okay.  Did you call your supervisor?
24     A.   Yeah.
25     Q.   Okay.  And what -- and your supervisor fixed

1    it so that he could simply do it over the phone?

2         A.   I don't know if my supervisor fixed it, but he

3    was able to do the phone call over the phone.

4         Q.   Okay.  And were you with him when he did that

5    phone call over the phone?

6         A.   I was.

7         Q.   Okay.  And it was -- you were in Portsmouth

8    with him, correct?

9         A.   Correct.

10        Q.   Okay.  On a -- like on a side street, looking

11   at -- he was on the phone and you had your tablet out?

12        A.   I don't know if I had my tablet out, but we

13   were literally outside on the sidewalk.  There could

14   have -- we were outside on the sidewalk.  He was on the

15   phone.  I don't know what I was doing.

16        Q.   Okay.

17        A.   But I was there.

18        Q.   You remember -- were you showing him the

19   slides on your tablet or your phone?

20        A.   No.

21        Q.   Okay.  All right.  So he was on the phone with

22   somebody else and you weren't really participating; you

23   were just present?

24        A.   Correct.

25        Q.   Okay.  All right.  And that lasted about an

1  hour?

2       A.    Yeah.  I don't know.  But it was -- yes.

3       Q.    Okay.

4       A.    I don't know.

5       Q.    You didn't overhear the conversation?

6       A.    I mean, I knew what they were talking about,

7  so -- I didn't hear every single word --

8       Q.    Okay.

9       A.    -- but I could hear Chris's response.  But I

10 think the other person was doing a lot of talking.

11      Q.    Okay.  All right.  But you didn't hear what

12 the other person was saying?

13      A.    No.

14      Q.    So you don't really know what they were

15 training him on, what they told him to do?

16      A.    I have no idea.

17      Q.    Okay.  And you have no idea what his -- what

18 they told him his responsibilities were --

19      A.    I have no idea.

20      Q.    -- over the phone?  Okay.  All right.

21            So after an hour, he was ready to be a

22 speaker?

23      A.    Yes.

24      Q.    Okay.  So INSYS found a way to whittle down a

25 week-long program down to an hour?

1       A.    It appears that way, yes.

2       Q.    Okay.  All right.  Did that seem odd to you?

3       A.    I just didn't even bother with that portion of

4  it.  I just was like, great, let's go, like ...

5       Q.    Okay.  All right.  All right.  So he was ready

6  to speak at that point?

7       A.    Correct.

8       Q.    All right.  And you were actually -- it sounds

9  like you were getting very friendly with him?

10       A.    Yeah.  We were spending a lot of time

11  together.

12       Q.    Okay.  Like you said, you had gone up to

13  dinner with him up in Portland, Maine?

14       A.    Uh-huh.

15       Q.    And you guys were in Portsmouth this day, the

16  day of his training?

17       A.    Yup.

18       Q.    Okay.  Was there a dinner that day, too, or

19  what went on in Portsmouth?

20       A.    I don't remember if there was a dinner.

21       Q.    Okay.  Were there several dinners that you

22  went on together with him?  They were social dinners.

23       A.    Not several, no.

24       Q.    Okay.

25       A.    There was a few in the beginning when I was

87

1    luring him in to be a speaker.

2          Q.    Okay.   There was also time that you spent with

3    him in Boston a few times, correct?

4          A.    A few times that we spent in Boston together.

5    We went to a Red Sox game together.

6          Q.    Okay.  And it was actually a World Series game

7    you went to?

8          A.    Yes, it was.

9          Q.    Okay.  And you went with his dad, too?

10         A.    And his cousin --

11         Q.    And his cousin?

12         A.    -- a female cousin.

13         Q.    A female cousin.  Okay.  So there were four of

14   you that went?

15         A.    Yes, there was.

16         Q.    All right.  Were there other social events you

17   went to with Chris that were nonwork-related?

18         A.    Other social events that I went to with Chris

19   that were non-work-related.  I don't remember.

20         Q.    Okay.  Now, so you became to know Chris pretty

21   well, correct, during this -- these social engagements

22   you had with him?

23         A.    Yes.

24         Q.    Okay.  And he kind of had a dry sense of

25   humor?

1      A.    He has a sarcastic sense of humor, yes.

2      Q.    Sarcastic sense of humor.

3            He was very serious on many occasions?

4      A.    Was he very serious?

5      Q.    Yes.

6      A.    No.

7      Q.    Okay.

8      A.    He's not really serious.

9      Q.    He was more -- he was more of a jovial person

10  with you?

11     A.    He just was some days good, some days bad.

12  Like it just -- he definite -- I mean, he was going

13  through a divorce, so, therefore, it's an emotional

14  time.

15     Q.    Okay.

16     A.    So he's --

17     Q.    And you -- as you said, you were trying to

18  lure him to be your prescriber.  You were kind of there

19  to be a friend and listen to him when he had problems

20  with that?

21     A.    The practice that INSYS gave us --

22     Q.    Uh-huh.

23     A.    -- is to -- if your -- if the -- if your

24  prescriber likes basketball, learn about basketball.  If

25  your prescriber likes to eat vegan, learn how to cook

```
 1   vegan.
 2           So they wanted us to become interested in the
 3   things that prescribers were interested in with -- in
 4   order to have a commonality to be able to have a friend
 5   relationship.
 6       Q.   Okay.  And you did that with Chris --
 7       A.   Yes.
 8       Q.   -- Mr. Clough?
 9       A.   I did.
10       Q.   Okay.  And you learned personal things about
11   him regarding his divorce?
12       A.   Yeah, in a not full detail -- I don't know --
13       Q.   Yeah.
14       A.   -- full details, but I knew that he was going
15   through a divorce, especially because his wife worked in
16   the practice.  So it wasn't something that necessarily
17   he had told me, but it was complete gossip in this one
18   office.
19       Q.   Okay.  So you heard -- you heard a lot of it
20   through gossip about his divorce?
21       A.   Absolutely.
22       Q.   Okay.  And you used that to try to, again,
23   lure him in?
24       A.   I didn't use it against --
25       Q.   The information.
```

1      A.    I mean, I don't know what I would have used
2   about that he's going through a divorce.
3      Q.    Okay.
4      A.    Because I wasn't divorced, so that wasn't a
5   commonality.
6      Q.    But did you at least try to be there for him
7   when he wanted to talk about it?
8      A.    There were times, yes.
9      Q.    Okay.  All right.  Almost like -- I don't want
10  to say it like, well, a shoulder to cry on?
11     A.    He did not cry on my shoulder, no.
12     Q.    Okay.
13     A.    But, yeah, if he was having a bad day because
14  he was going through something --
15     Q.    Uh-huh.
16     A.    -- I'm a nice person and I'm going to say,
17  what's going on, you seem a little off, what's up,
18  da-da-da.  It's just --
19     Q.    Okay.
20     A.    -- kind of the way that normal people act.
21     Q.    Okay.
22           THE COURT:  All right.  Let's take the morning
23  break.
24           THE CLERK:  Please rise for the jury.
25                    (Jury excused.)

1          THE COURT:  Anything for the Court?

2          MR. RICHARD:  No, thank you.

3          THE COURT:  Okay.  We're in recess 15.

4      (Recess taken from 10:47 a.m. until 11:05 a.m.)

5          MR. RICHARD:  May I continue, your Honor?

6          THE COURT:  Please proceed.

7      Q.   Again, Ms. Babich, after you met with Michael

8  with -- the patient Michael and Chris in that treatment

9  room --

10     A.   Yes.

11     Q.   -- Mr. Clough's prescriptions started to get

12  more and more, correct?

13     A.   Yes.

14     Q.   Okay.  And he started with a small group of

15  people first, four or five patients?

16     A.   Yes.

17     Q.   Okay.  And then when he saw it was -- the

18  SUBSYS was working with these patients, he started to

19  look for more patients?

20     A.   Yes.

21     Q.   And so he could write more scripts?

22     A.   Yes.

23     Q.   Okay.  And after a short period of time, his

24  prescription writing took off, for lack of a better

25  word?

```
1          A.   Yes.

2          Q.   There were more and more?

3          A.   Yes.

4          Q.   Okay.  And he kept finding more patients --

5          A.   Yes.

6          Q.   -- for you?

7          A.   (Nods head.)

8          Q.   And he kept finding ways where -- what they

9     call titrate up, correct?

10          A.   Yes.

11          Q.   Okay.  Titrating it means you start at a low

12     dose and move up to a higher dose?

13          A.   Yes, it does.

14          Q.   Okay.  Is that something that you were trained

15     on at the seminar you went to in Arizona?

16          A.   Yes.

17          Q.   Okay.  Now, Chris would titrate his patients

18     up, correct --

19          A.   Yes.

20          Q.   -- when he needed to?

21          A.   Yes.

22          Q.   Okay.  Now, he didn't write SUBSYS for all of

23     his patients, correct?

24          A.   I don't know, but I would assume no.

25          Q.   Okay.  But he wrote for a good amount of his
```

1    patients?

2         A.    Yes.

3         Q.    Okay.  And he told you that a lot of his

4    patients were having some success with the drug?

5         A.    Yes.

6         Q.    Okay.  And he was very happy with the drug?

7         A.    Yes.

8         Q.    Okay.  And he told you that, that he was

9    happy?

10        A.    Yes.

11        Q.    Okay.  And you indicated yesterday when there

12   was a dinner that he also told Mr. Roper he was happy

13   with the drug?

14        A.    Yes.

15        Q.    Okay.  All right.  As a matter of fact, he was

16   actually kind of excited about how well it worked with

17   his patients, correct?

18        A.    Yes.

19        Q.    Okay.  All right.  And that, of course, made

20   you happy?

21        A.    Yes.

22        Q.    Because you were finally getting all those

23   prescriptions you wanted?

24        A.    Needed, yes.

25        Q.    Needed.  Okay.  And you finally realized you

94

1    were going to get paid?

2         A.   Correct.

3         Q.   And there was a chance you could have got that

4    big check?

5         A.   Correct.

6         Q.   Okay.  All right.  Now, when Chris wanted --

7    sorry, Mr. Clough wanted to get new patients on SUBSYS,

8    he would approach you and let you know that he had a new

9    patient?

10        A.   Yes.

11        Q.   Okay.  And you said you would look at his

12   medical -- at the medical records of the patients?

13        A.   I did.

14        Q.   Okay.  And you would use those records to help

15   create that -- a form for the IRC?

16        A.   Yes.

17        Q.   Okay.  And sometimes you said you would bring

18   those home?

19        A.   I did.

20        Q.   And then return them back?

21        A.   Yes.

22        Q.   Okay.  And you said that someone at the office

23   would give you these records?

24        A.   Yes.

25        Q.   Okay.  And it wasn't always Mr. Clough?

1        A.    Not always.

2        Q.    Okay.  All right.  And how quickly could you

3   get the authorization for SUBSYS for these patients?

4        A.    It's usually 48 to 72 hours.

5        Q.    48 to 72 hours?

6        A.    (Nods head.)

7        Q.    Okay.  And that was with the help of the IRC?

8        A.    Yes.

9        Q.    Okay.  And, again, that's the preauthorization

10  program in Arizona?

11        A.    Yes.

12        Q.    Okay.  All right.  Now, you rarely had to ask

13  Chris to get new patients, correct?

14        A.    Yes.  I rarely had to ask, yes.

15        Q.    Because he seemed to always be doing it?

16        A.    Yes.

17        Q.    Okay.  But you would go in and say, do you

18  have any new patients?

19        A.    When I saw him, yes.

20        Q.    Okay.  And you said you were very casual about

21  it?

22        A.    I was.

23        Q.    Okay.  And at the same time sometimes you

24  would mention speaking, would you ask if he had new

25  patients, right?  The speaking programs.

1        A.    We would talk about the speaker programs, yes.

2        Q.    Okay.  And again you were casual about that?

3        A.    Yes.

4        Q.    Okay.  Now, there was also no need to ask

5   Chris for a titration, correct?

6        A.    There was no need to ask to ask Chris for a

7   titration, no.

8        Q.    Because he was doing it on his own?

9        A.    Yes.

10       Q.    And, again, we -- I don't know if you did

11   discuss it yesterday or not, but if a patient was

12   titrated up from a low dose to a higher dose, that meant

13   more of a commission to you, correct?

14       A.    It did, yes.

15       Q.    Okay.  So you were happy then that you didn't

16   have to pressure Chris to do this?

17       A.    Correct.

18       Q.    Okay.  All right.  And he seemed very

19   passionate about SUBSYS with his patients?

20       A.    Yes.

21       Q.    Okay.  And that's what you were looking for,

22   right --

23       A.    Yes.

24       Q.    -- a passionate doctor?

25       A.    Yes.

1      Q.    That's what you were trained to look for?

2      A.    Yes.

3      Q.    Okay.  Right.  And he was your doctor now?

4      A.    Correct.

5      Q.    Okay.  And as they trained you to do, you

6   moved in with him?

7      A.    I didn't move in with him.

8      Q.    I don't mean move in.

9      A.    No, I didn't.

10     Q.    For the record, you didn't move in as in

11  physically move in with him, but you spent a lot of time

12  with him.

13     A.    I did.

14     Q.    Okay.

15     A.    As instructed by home office, yes.

16     Q.    Okay.  All right.  And part of that was

17  obviously having these lunch or dinner meetings,

18  correct, where he would speak?

19     A.    Yes.

20     Q.    Okay.  And there were many lunches at

21  PainCare, correct?

22     A.    Yes.

23     Q.    Okay.  And there were speaking engagements for

24  him, for Chris, Mr. Clough?

25     A.    Yes.

1    Q.   Okay.  At the time of his first speaking

2  engagement, was his first engagement at PainCare where

3  he would go over the slides?

4    A.   I don't remember if his first one was there.

5    Q.   Okay.  All right.  So his -- his first

6  speaking engagement was memorable to you?

7    A.   I don't remember where it was.

8    Q.   Okay.  All right.  But there were several at

9  PainCare, correct?

10   A.   There were.

11   Q.   Okay.  And some of the doctors were there?

12   A.   Yes.

13   Q.   Okay.  There was a Dr. Schermerhorn that was

14 there?

15   A.   Yes.

16   Q.   Okay.  And there were several PAs?

17   A.   Yes.

18   Q.   Leah Clough was there, correct?

19   A.   Yes.

20   Q.   Okay.  Do you remember the names of any of the

21 other PAs that were there on different occasions?

22   A.   I mean, I know all PAs in his office, so I can

23 list them, but I don't know if they were there at that

24 specific one.

25   Q.   Okay.

1          A.    I was there so often.

2          Q.    But how many -- do you recall how many events

3     were actually at the PainCare facility?

4          A.    I don't know the number.

5          Q.    Okay.  Were there more than five?

6          A.    Yes.

7          Q.    Okay.  Less than ten or more than ten?

8          A.    For speaker programs?

9          Q.    Correct.

10         A.    About ten.

11         Q.    Okay.  And at these programs, a lot of people

12    from PainCare would be there, correct?

13         A.    Yes.

14         Q.    Okay.  And it was usually during their lunch

15    break?

16         A.    Correct.

17         Q.    Okay.  So even office staff was there?

18         A.    Yes.

19         Q.    Not prescribers.  I mean, not always -- not

20    just prescribers?

21         A.    Correct.

22         Q.    Okay.  All right.  And they were from

23    different PainCare locations that would come to

24    Somersworth, correct?

25         A.    They were invited, but they didn't come.

1    Q.    Okay.  Were there ever speaking engagements at

2    the other PainCare clinics?

3    A.    Newington.

4    Q.    At Newington.  Okay.  And Newington was -- it

5    was, again, the same company, just a different location?

6    A.    Correct.

7    Q.    And Chris would speak there as well?

8    A.    Yes.

9    Q.    Do you remember how many you did there?

10   A.    I don't remember.

11   Q.    At the Newington location, you would have

12   doctors there, correct?

13   A.    Yes.

14   Q.    Okay.  And PAs were there as well?

15   A.    Yes.

16   Q.    And then office staff?

17   A.    Yes.

18   Q.    Okay.  And Chris would speak about the drug to

19   these individuals, correct?

20   A.    He would -- I would have marketing material on

21   the table.  He would talk about it, but we did not go

22   over a full slide deck.

23   Q.    Okay.  Would you bring the slide deck?

24   A.    The slide deck was on my iPad.

25   Q.    Okay.

1        A.    I always had the iPad with me.

2        Q.    Okay.  Did you always bring it into the

3   program?

4        A.    Always.  I had it in my purse, yes.

5        Q.    Okay.

6        A.    It was always with me.

7        Q.    Okay.  All right.  And there was always food

8   there as well for people?

9        A.    Yes.

10        Q.    Okay.  And it was usually catered?

11        A.    Yes.

12        Q.    Okay.  All right.  Now, there were -- we had

13   talked earlier or you had talked earlier today about

14   outside dinners; isn't that correct?

15        A.    Yes.

16        Q.    Outside speaking engagement dinners.

17        A.    Yes.

18        Q.    Okay.  And some were in Portsmouth?

19        A.    Yes.

20        Q.    Okay.  And some were in Boston?

21        A.    Yes.

22        Q.    Okay.  And there were some where actual --

23   where people actually did show; some providers actually

24   did show, correct?

25        A.    Correct.

1      Q.   Okay, so they weren't -- there were only

2  several occasions when nobody actually showed, no

3  prescribers, correct?

4      A.   I don't really understand the question.  I'm

5  sorry.  Like I just don't know.

6      Q.   There were only a small numbers of programs

7  where no providers showed up at all?

8      A.   That is not true.

9      Q.   That isn't true?  Okay.  We talked about seven

10  today.

11      A.   Yes.

12      Q.   Okay.  There were more than seven where no one

13  showed up?

14      A.   Yes.

15      Q.   Okay.  And whose job was it to get people to

16  show?

17      A.   My job.

18      Q.   That was your job.  And at first you tried to

19  do it, right, to get people to show?

20      A.   Yes, I did.

21      Q.   Okay.  How'd you do that?

22      A.   I -- INSYS provided an invitation, like we

23  went over earlier --

24      Q.   Uh-huh.

25      A.   -- and I would go to various offices, hang

1    them on their lunch bulletin boards, tell the front desk

2    ladies, email people, just kind of market however I

3    could.

4        Q.    Okay.  And who was in charge of setting up

5    where they were?

6        A.    My -- I picked the -- the rep picks the

7    restaurant and tells the home office and home office

8    is the one who schedules the -- calls and makes the

9    reservation and does all of that.

10       Q.    So they were supposed to call -- make a

11   reservation at the restaurant?

12       A.    Yes.

13       Q.    Okay.  And did they ever, with Mr. Clough, set

14   it up in a private room?

15       A.    They would either -- they would set it up in a

16   private room or a table off to the side.  And if we knew

17   that nobody was coming to the dinner, we just wouldn't,

18   the two of us, sit in a private room of ten empty

19   chairs.  We would just say, oh, we don't need it

20   tonight, people aren't showing up.  So we would just sit

21   at a table, the two of us.

22       Q.    All right.  All right.  And you said you had a

23   tablet in your purse at all times?

24       A.    My iPad, yes.

25       Q.    The iPad.

1      A.    Yup.

2      Q.    Okay.  All right.  And you said you brought

3  that in to these dinners?

4      A.    Yeah, I had it all the time with me.

5      Q.    Okay.  So it was available for Chris to use if

6  he wanted to use it?

7      A.    Yes.

8      Q.    Okay.  Did you ever offer it to him while he

9  was sitting at the dinners, your tablet, the iPad?

10      A.    Not when it was the two of us, no.

11      Q.    Okay.  Okay.  Now, towards the end of your

12  time with INSYS, you didn't even bother trying to get

13  anybody anymore to show up at these events?

14      A.    I did not bother because Chris was a PA and

15  MDs did not want to come to the dinners where a PA was

16  speaking to educate them.  They did not want to come.

17      Q.    Okay.  So then you started using these dinners

18  yourself then to just keep Chris happy?

19      A.    To keep Chris paid.

20      Q.    Keep him paid.  Okay.  But you -- how much

21  time would you spend with him at these dinners when no

22  one would show up?

23      A.    We would -- very normal time.  Dinner, order,

24  like just a very normal dinner time.

25      Q.    Okay.  Socializing, you would talk?

1          A.    Yes, we talked.

2          Q.    Yeah.  And you, again, kept trying to show him

3    that you were his friend during these events?

4          A.    I mean, friends, colleagues -- I mean, I

5    socialized with him, but friends invite people over to

6    their house or friends do things together -- invite --

7    we didn't -- we weren't friends.

8          Q.    Okay.  All right.  But you were friendly with

9    him?

10         A.    Of course.

11         Q.    Okay.  Again, you were still trying to keep

12   him happy so he would write scripts, correct?

13         A.    Yes.  I wanted to continue to have him being a

14   speaker, to write scripts for me in my business, yes.

15         Q.    Okay.  You had discussed earlier that you

16   were -- early on you were luring him in?

17         A.    Yes.

18         Q.    And now I guess the best way to put it, we'll

19   use a fishing reference, you were trying to keep him on

20   the hook?

21         A.    No, I wouldn't say keep him on the hook.  I

22   would just say my job through the company was to keep

23   your speakers wanting to speak.

24         Q.    Okay.

25         A.    And so that -- like I said before, just

1    develop an interest in them, become compassionate to

2    something that's going on in their difficult life, to

3    just make their life easier and not be a nuisance in

4    their life.

5        Q.   Okay.  Now, regarding some of this -- the

6    policies of the company, your sales approach with

7    Mr. Clough was a lot different than what the -- your

8    supervisors wanted the approach to be, correct?

9        A.   I don't believe so, no.

10       Q.   You said you were very casual, correct?

11       A.   Yes.

12       Q.   That you would casually mention new patients

13   with Chris?

14       A.   Uh-huh.

15       Q.   And you would casually mention new programs,

16   new speaking programs?

17       A.   Yes.

18       Q.   Okay.  But the -- your bosses, your

19   supervisors, were actually more demanding; isn't that

20   correct?

21       A.   Maybe in their tone, but a -- someone who's

22   having a casual conversation --

23       Q.   Uh-huh.

24       A.   -- it is still -- there is a point at the end

25   of a casual conversation.

1    Q.    Uh-huh.

2    A.    So the message was clear, whether I said it

3    casual or we were sitting down as a business meeting.

4    Even though my tone was casual, the point was made very

5    clear.

6    Q.    Okay.  Now, your bosses told you no

7    prescriptions, no programs, correct?

8    A.    Yes.

9    Q.    Okay.  And they told you that in emails?

10    A.    Yes.

11    Q.    Okay.  And those emails weren't to be shared

12    with the doctors, correct?

13    A.    I did not share them with the doctors, no.

14    Q.    Okay.  All right.  Now, just so we can talk a

15    little bit more about some of the visits that PainCare

16    did -- while Chris was a speaker, did Jeffrey Pearlman

17    go to PainCare --

18    A.    Yes.

19    Q.    -- with you?

20    Okay.  How often would he go with you?

21    A.    He went one time.

22    Q.    One time.  And he didn't go in with you; isn't

23    that correct?

24    A.    No, he sat in my car in the parking lot.

25    Q.    Okay.  And that was because he didn't want to

```
 1   be a male threat to Chris?
 2        A.   You could say that, yes.
 3        Q.   Okay.  The company knew that -- or the
 4   company -- you had let the company know that Chris had
 5   feelings for you?
 6        A.   I told the company that Chris didn't -- I
 7   didn't need any other help --
 8        Q.   Uh-huh.
 9        A.   -- I didn't need a supervisor to help me get
10   scripts with Chris.
11        Q.   Okay.
12        A.   I could do it by myself.
13        Q.   Okay.  Did you ask Jeffrey Pearlman just to
14   stay in the car then when he did go up to PainCare with
15   you?
16        A.   I actually didn't ask him.  I asked -- Alec
17   Burlakoff had called me earlier in the week and I had
18   talked to Alec about Jeff riding with me, that it really
19   wasn't necessary.
20        Q.   Uh-huh.
21        A.   So he called Jeff himself and said, I
22   understand that you are doing a ride-along with Natalie,
23   but do not go into her offices.
24        Q.   Okay.  And did they tell you why?
25        A.   Did -- they didn't tell me why.  I said I
```

```
1    didn't need help.
2         Q.   Okay.  All right.  But Jeffery Pearlman still
3    insisted on going on a ride-along?
4         A.   I think it was his responsibility as -- to
5    come to the rep's territories, check in, see what we're
6    doing.
7         Q.   All right.  But you didn't bring Jeffrey into
8    the building to meet Chris?
9         A.   I did not.  He did not come in.
10        Q.   Okay.  All right.  Now, yesterday you
11   testified a little bit about the speaking programs
12   that -- where nobody would show up?
13        A.   Yes.
14        Q.   You talked about the forms being filled out,
15   right?
16        A.   Yeah.
17        Q.   Yesterday you said that you would fill out the
18   forms; isn't that correct?
19        A.   I would fill out half of the form.
20        Q.   Half of the form, and then you said Chris
21   would sign them?
22        A.   I -- yes.
23        Q.   Okay.  And now today you said that Chris
24   actually filled out the forms; isn't that correct?
25        A.   Chris signed the forms.
```

1      Q.    He didn't fill them out?

2      A.    I filled out the -- if you showed me a form, I

3  could tell you what I filled out.

4      Q.    Okay.  All right.

5            If we could pull up number 603, please.

6            This is Exhibit 603.

7      A.    Yes.

8      Q.    So in this form, you filled out all the names,

9  correct?

10     A.    No, I didn't -- I -- no, I didn't fill out

11 this whole form, no, all the names on the form, no.

12     Q.    Okay.  And you say Chris did that?

13     A.    The only thing that Chris did on this

14 particular form was do the signature.  I filled out

15 everything else.

16     Q.    Okay.  Now, there were times when no one would

17 show up --

18            You can take that down.  Thank you.

19            Where no one would show up and it would be

20 just you, Chris, and you had an assistant named Jessica,

21 correct?

22     A.    I did, yes.

23     Q.    And sometimes Jessica would be there, the

24 three of you, correct?

25     A.    Yes.

1     Q.   Okay.  Now, on these forms, sometimes Jessica
2  would sign the names; isn't that correct?
3     A.   Yes, she did.
4     Q.   Okay.  And sometimes she would fill them out
5  as well?
6     A.   Like I would fill out the print, yes.
7     Q.   Okay.  And sometimes you would sign them as
8  well?
9     A.   I would not sign them.
10    Q.   You would not.  So you had a form in hand --
11    A.   Uh-huh.
12    Q.   -- and you had a pen in your hand --
13    A.   Uh-huh.
14    Q.   -- and you were filling out these forms?
15    A.   Yes.
16    Q.   And you filled out all the information that
17 was in there and all that other people gave to you --
18    A.   Yes.
19    Q.   -- for information, but you wouldn't sign it?
20    A.   I wouldn't sign it.
21    Q.   Why wouldn't you sign it?
22    A.   I worked for a hospital for five years and I
23 knew that you just don't sign a doctor's name.
24         But I also knew that these were sham speaker
25 programs --

```
 1        Q.    Uh-huh.
 2        A.    -- and if I was to fill out all the
 3   information, I needed someone else to have skin in the
 4   game, too.  So I did half of it and the other person did
 5   half of it.
 6        Q.    Oh, so you wanted -- skin in the game, you
 7   mean you wanted someone else to be on the hook with you?
 8        A.    Yes.
 9        Q.    Okay.  All right.
10              Now, if I could just put up 702 one more time.
11              Did I say 702?  I think it was 603.  I'm
12   sorry.
13              MR. AFRAME:  Can we approach for a second,
14   Judge?
15              THE COURT:  You may approach.
16                        AT SIDEBAR
17              MR. AFRAME:  I do think that that last line of
18   questioning was challenging the notion that Mr. Clough
19   signed the forms, which is something he admitted to
20   doing in the proffer and I would ask that at the
21   appropriate time we be allowed to present that aspect of
22   his proffer through the FBI agent.
23              THE COURT:  Let me ask you a couple questions
24   first.
25              Are you challenging that he signed them or
```

1    were you just sort of exploring?

2          MR. RICHARD:  I'm exploring right now.  I

3    didn't -- I never said that Chris never signed them or

4    never suggested to her that Chris never signed any of

5    them.

6          THE COURT:  Yeah.  And she didn't -- and she

7    said Chris -- I mean, he hasn't elicited evidence that

8    anybody but Chris signed them.  I understand what you're

9    saying, though, that that's her tone of the questioning.

10         I mean, are you prepared to stipulate that he

11   signed them?

12         MS. GAGNE:  (Shakes head.)

13         THE COURT:  She's --

14         MR. RICHARD:  Signed all of them?  No.

15         THE COURT:  One defense counsel is shaking her

16   head no.

17         MR. RICHARD:  No, of course not.  I --

18         THE COURT:  Well, then, I mean, if you're

19   going to present evidence that he didn't sign them --

20   are you going to present evidence when he testifies that

21   he didn't sign any of them?

22         MR. RICHARD:  No.

23         THE COURT:  Okay.  I mean --

24         MR. AFRAME:  So, I mean, I suppose we can ask

25   him on cross whether he signed them and if he says no,

```
 1    then it's --
 2              THE COURT:  Absolutely.
 3              MR. ROMBEAU:  Right.  Then we'll get --
 4              THE COURT:  So it's sort of kicking the can
 5    down the road.
 6              MR. AFRAME:  Okay.
 7              THE COURT:  All right.
 8              MR. AFRAME:  But I do think that was at least
 9    close to the line.
10              THE COURT:  Consider the can kicked.
11              Anything else?
12              MR. AFRAME:  No.
13              THE COURT:  Thank you.
14                        CONCLUSION OF SIDEBAR
15              MR. RICHARD:  May I have just a brief moment,
16    your Honor?
17              THE COURT:  Yes.
18              MR. RICHARD:  Thank you.
19              Actually, can I take -- leave that off, if you
20    would.  Thank you.
21         Q.   Now, Ms. Babich, you said your base pay for
22    this job was $40,000?
23         A.   Yes.
24         Q.   Okay.  And you eventually made over $400,000
25    in commissions?
```

1      A.   I did.

2      Q.   Okay.  And that was the span of about 19

3  months working for the program?

4      A.   18 months, yes.

5      Q.   18 months, okay.  What did you do with that

6  money?

7      A.   I have the money.

8      Q.   Okay.  Did you give any back?

9      A.   No.

10      Q.   Okay.  Did -- well, you had said earlier you

11  didn't like what you had been doing and you thought it

12  was unethical, correct?

13      A.   Yes.

14      Q.   So do you think it was inappropriate for you

15  to hold on to that money?

16      A.   I didn't even think of it.

17      Q.   Okay.  All right.  Did you give any of it to

18  charity?

19      A.   I did not give it to charity, no.

20      Q.   Okay.  So is it sitting in a bank account

21  somewhere?

22      A.   Yes.

23      Q.   Okay.  Did you spend it on your wedding?

24      A.   No.

25      Q.   Okay.  Did you spend it on a house?

1    A.    I did use a hundred thousand dollars of it.

2    Q.    To buy a house?

3    A.    To buy a house for my mom, because she lost

4  her house in the Puerto Rico hurricane.

5    Q.    Okay.  All right.  You didn't use any of that

6  money to buy your own house?

7    A.    I did not.

8    Q.    Okay.  Now, you indicated earlier you were --

9  you married your husband in 2015?

10    A.    Yes.

11    Q.    Okay.  And your husband was working for INSYS?

12    A.    Yes.

13    Q.    Okay.  Do you know what his base pay was?

14    A.    I do not.

15    Q.    Okay.  Do you know what he received in

16  commissions from INSYS?

17    A.    I do not.

18    Q.    Okay.  In 2015, did you file -- or for the

19  2015 tax year, was he still working for INSYS?

20    A.    In 2015, he was working for INSYS.

21    Q.    Okay.  And did you file joint tax returns for

22  that year?

23    A.    I don't remember.

24    Q.    You don't remember.  Okay.  Would you have

25  looked at them if you did?

1      A.    I would have signed them.  Yes, I would have

2    looked at them.

3      Q.    Okay.  Now, your husband's -- your husband has

4    also been indicted in this event; isn't that correct?

5      A.    Yes.

6      Q.    Okay.  And that's out of the district of

7    Massachusetts?

8      A.    Yes.

9      Q.    Okay.  You indicated earlier that you were

10   testifying through a cooperation agreement with the

11   government?

12     A.    No.  No.

13     Q.    Okay.  You were testifying in hopes of

14   reducing your sentence?

15     A.    Yes.

16     Q.    Okay.  And you indicated that you could be

17   going to prison for five years?

18     A.    Yes.

19     Q.    Okay.  And what is your expectation if you

20   testify appropriately as to what your sentence would be?

21     A.    If I were to tell the truth, I would hope that

22   my sentence would be lessened.

23     Q.    Okay.  When you say lessened, you mean no jail

24   time?

25     A.    Yes, because I have two children at home.

1      Q.   Okay.  Now, do you think that with your

2  testimony you can also help the sentence of your husband

3  if he were to be found guilty?

4      A.   No.

5      Q.   Okay.  I'm sorry to ask it this way, but I

6  have to ask.  So if you do go to jail, who would watch

7  your kids?

8      A.   My husband.

9      Q.   Your husband.  And what happens if he goes to

10 jail?  Who watches your kids?

11     A.   Me.

12     Q.   What happens if you both go to jail?

13          MR. AFRAME:  Objection, relevance.

14          THE COURT:  Overruled.

15     Q.   Who watches your kids?

16     A.   Parents.

17     Q.   Okay.  And your parents still live local?

18     A.   My parents are divorced.

19     Q.   Okay.  Do they still live local?

20     A.   One lives in Connecticut; one lives in

21 Arizona.

22     Q.   Okay.  All right.  So they live local to --

23 one of them, at least, lives local to you?

24     A.   Now, yes.

25     Q.   Okay.  All right.  Now, your testimony, you

```
 1    think, will help you get a reduced sentence?
 2         A.   Do I think it will?
 3         Q.   Yes.
 4         A.   I don't know if it will.
 5         Q.   Okay.  But you're hoping it will?
 6         A.   Yes.
 7         Q.   Okay.  And you want to make sure you can
 8    protect your family with your testimony, correct?
 9         A.   Yes.
10         Q.   Okay.  And you'd do anything to help your
11    family?
12         A.   Not anything, no.
13         Q.   Okay.  You'd do anything to help your kids?
14         A.   Not anything, no.
15              MR. RICHARD:  Okay.  Thank you.
16              Thank you, your Honor.  Nothing further.
17              THE COURT:  Redirect.
18                      REDIRECT EXAMINATION
19    BY MR. ROMBEAU:
20         Q.   Natalie, did you plead guilty to a felony in
21    connection with the activities you've been testifying
22    about here?
23         A.   Yes, I did.
24         Q.   Has anyone promised you anything about what
25    will happen at your sentencing in March?
```

1    A.    No promises have been made, no.

2    Q.    I'm sorry.  Was it in March?  I'm --

3    A.    It's March of 2019, yes.

4    Q.    Attorney Richard was asking you some questions

5 about the money you made while working at INSYS.  Do you

6 know if you're going to lose that money at the time of

7 your sentencing?

8    A.    There is a possibility, yes.

9    Q.    Your hopes of a reduced sentence, what happens

10 to those hopes if you lie here in court?

11    A.    That I would fulfill the sentence and

12 potentially be in more trouble.

13    Q.    Attorney Richard asked you a few questions

14 about patient experiences -- the patient experiences of

15 Mr. Clough.  I know you testified you were in the

16 meeting with patient Michael W.  Did you meet with all

17 of Mr. Clough's patients who received SUBSYS?

18    A.    No, I did not.

19    Q.    Okay.  Do you know what those patients were

20 saying to Mr. Clough in their regular appointments that

21 you did not attend?

22    A.    I have no idea.

23    Q.    Okay.  You referenced briefly on

24 cross-examination the prescription you got through

25 Dr. Jackel, is it?

1    A.    Yes.

2    Q.    Okay.  And was that the first prescription

3  that you got a doctor or provider to sign for SUBSYS?

4    A.    Yes, it was.

5    Q.    Okay.  Do you remember if that -- that

6  prescription actually got filled and -- and paid for?

7    A.    The prescription got filled and sent to the

8  patient.  The patient was using it.  But it did not get

9  approved through insurance and it did -- I made no money

10  off of it.  The company picked up the -- paid for the

11  prescription.

12    Q.    And how was that reflected on your sort of

13  bottom line at the company?

14    A.    It went against -- it went against me.

15    Q.    Okay.  So the first script that actually

16  results in a -- being paid for, is that the one with

17  Dr. Greenspan?

18    A.    Yes.

19    Q.    Okay.  And for that patient Michael W., Dr.

20  Greenspan just wrote the one -- was it just the one

21  month before Mr. Clough took him over?

22    A.    Yes.

23    Q.    Attorney Richard asked you a number of

24  questions about the lunches or the two different types

25  of lunches and I just want to make sure this is clear.

1        Was the lunch-and-learn, did that involve any

2   paid speaker component?

3        A.   No, it did not.

4        Q.   Okay.  For the -- for the paid speaking

5   lunches, is it your understanding that Mr. Clough -- let

6   me ask it this way.

7        For the other lunches, was it your

8   understanding Mr. Clough was paid in order to show up in

9   his own office?

10       A.   Yes, he was shown up to pay in his own office

11   (sic).

12       Q.   And there were some questions about some of

13   the individuals who came to those lunches.  Would people

14   often grab food and go?

15       A.   Some people would, some people wouldn't.  Yes.

16       Q.   In -- in all the time of these dinners with --

17   with Mr. Clough that we covered over many months, did he

18   ever say, this is wrong?

19       A.   He never said that this is wrong.

20       Q.   Did he ever say, I can't do this, stop asking

21   me to sign things?

22       A.   No, he did not.

23       Q.   Did he ever question why you couldn't find

24   people to show up for the events?

25       A.   I just had told him about his title and that I

1    was -- I was struggling to get MDs to come to his dinner
2    because he was a PA.
3         Q.   Did he ever say, well, let's just call off the
4    whole thing then, this doesn't make sense for me to be a
5    speaker?
6         A.   No, he did not.
7              MR. ROMBEAU:  Nothing further.
8              THE COURT:  Recross?
9              MR. RICHARD:  Very brief.
10                        RECROSS-EXAMINATION
11   BY MR. RICHARD:
12        Q.   Mr. Rombeau asked you about the money that you
13   earned from sales of SUBSYS.
14        A.   Uh-huh.
15        Q.   You had indicated that you thought it could be
16   taken away from you in your sentencing, correct?
17        A.   Correct.
18        Q.   Okay.  Are you hoping that you'll be able to
19   keep the money?
20        A.   It doesn't matter to me.
21        Q.   It doesn't matter to you.  Okay.
22             Now, lastly, one more thing.  You had
23   mentioned something about telling Chris that you
24   couldn't get MDs to show up to his speaking events,
25   correct?

1    A.    Yes.

2    Q.    Okay.  And did you tell him that you were

3  afraid your bosses were going to get angry with you that

4  you couldn't get anyone there?

5    A.    Sorry.  Can you ask the question again?

6    Q.    Did you tell him that you were afraid that

7  your bosses would be angry with you that no one would

8  show up to these programs anymore?

9    A.    I don't remember.

10    MR. RICHARD:  Okay.  Nothing further.

11    THE COURT:  All right, Ms. Babich, you're

12  excused.

13    THE WITNESS:  Thank you.

14    (Witness excused.)

15    MR. ROMBEAU:  Your Honor, the government calls

16  Bridget Horan from the FBI.

17    THE CLERK:  Good morning.  If you could step

18  this way, please.

19    If you could step into the witness box and

20  remaining standing.

21    Please raise your right hand.

22    **BRIDGET HORAN**, having been first duly sworn,

23  testified as follows:

24    THE CLERK:  And, for the record, please state

25  your full name and spell your last name.

1          THE WITNESS:  Bridget Horan, H-o-r-a-n.

2          THE CLERK:  Thank you.  Please be seated.

3                    DIRECT EXAMINATION

4    BY MR. ROMBEAU:

5          Q.   Good morning, Ms. Horan.  Where are you

6    currently employed?

7          A.   The FBI.

8          Q.   Okay.  Is there a particular field office or

9    location you work out of?

10         A.   Yes, the Boston office.

11         Q.   What do you do for the FBI?

12         A.   I'm a forensic accountant.

13         Q.   What -- what does that mean?  What is a

14   forensic accountant?

15         A.   A forensic accountant is someone who reviews

16   financial information, financial transactions, for the

17   purposes of legal proceedings.

18         Q.   Do you have any education or training as an

19   accountant?

20         A.   I do.  I have a bachelor's degree in business

21   administration with essentially a major in accounting

22   and finance, and I have a master's degree in accounting.

23   I also have a certified public accountant license out of

24   the state of Massachusetts and I am also a certified

25   fraud examiner from the Association of Certified Fraud

1    Examiners.

2         Q.   Okay.  So you mentioned being a certified

3    public accountant.  Is that something we sometimes refer

4    to as being a CPA?

5         A.   Yes.

6         Q.   Okay.  What does that mean in sort of general

7    terms?

8         A.   So there are certain requirements in order to

9    attain the license.  It requires certain number of

10   college classes, specific classes in accounting.

11   There's a four-part exam you have to take.  There's work

12   experience requirements.  There's recommendations you

13   have to receive.  And once you receive your license, you

14   have to receive continuing education within the field

15   and every two years you have to receive 80 hours of

16   continuing education.

17        Q.   And I'm sorry if you said this, but is that

18   licensing as a CPA, is that determined by the state?

19        A.   Yes.

20        Q.   Okay.  And how long have you held that

21   designation as a CPA?

22        A.   I believe I received the designation in early

23   2014.

24        Q.   And in total, how long have you been with the

25   FBI?

1       A.      Approximately three years.

2       Q.      And I know I had you describe a little bit of

3   what a forensic accountant does, but how would you

4   describe what the kind of work you do for the FBI is on

5   a day-to-day basis?

6       A.      So I am assigned to the healthcare fraud unit

7   in the FBI Boston office.  So I work on healthcare fraud

8   cases.  I review bank records, financial statements, any

9   sort of financial records, and essentially our job is to

10  follow the money.

11      Q.      And out of your position in the Boston office,

12  have you been involved in the larger -- I'll call it the

13  INSYS case?

14      A.      Yes.

15      Q.      Okay.  Have you also been involved in our

16  New Hampshire portion, the Christopher Clough case?

17      A.      Yes.

18      Q.      Okay.  Did we ask you to do a few things in

19  connection with the case involving Mr. Clough?

20      A.      Yes.

21      Q.      Okay.  I want to talk about prescriptions

22  first.

23              What did we ask you to do regarding

24  Mr. Clough's SUBSYS writing of -- writing of the drug

25  SUBSYS?

1    A.   I was asked to review INSYS business records

2  and compile a list of prescriptions that were written by

3  and paid for -- written by Mr. Clough and then

4  eventually paid for.

5    Q.   Okay.  And so what sort of records are you

6  looking at through this process?

7    A.   There are records that were emailed around

8  with INSYS executives and the sales team regarding

9  prescriptions written by numerous physicians or

10  practitioners.

11    Q.   Okay.  Was -- would INSYS keep track of these

12  sales on any sort of regular basis?

13    A.   It wasn't a -- you know, once a month, but

14  they would periodically, you know, sometimes it was a

15  shorter period, sometimes it was a few months, they

16  would email out these records to their team.

17    Q.   And from those records, were you able to zero

18  in on the prescriptions that were written by Mr. Clough?

19    A.   Yes.

20    MR. ROMBEAU:  Okay.  Let's pull up

21  Exhibit 152, please.

22    Yes, please.

23    Q.   I'm going to spend a little time on this, so

24  don't worry if it's very small font in front of you.

25    Let me first ask you, what are we looking at

1    here in Exhibit 152?

2         A.    So these -- this is a compilation of the

3    records I reviewed, the INSYS business records.   The

4    records were in an Excel format, Microsoft Excel format,

5    which is basically just a table.   So this is the first

6    page of 13 where the majority of these columns came

7    directly from the INSYS records.

8              The last column was just a -- the strength

9    in micrograms I added, just for simplicity -- for

10   understanding.   It was derived from the column that says

11   NDC, which is a National Drug Code, which is basically

12   just a code for the drug and the drug strength.

13        Q.    Okay.   So the -- let me ask Ms. Blanco to zoom

14   in on maybe the first five lines or so and then I'll ask

15   you a few questions about that.   Hopefully it'll be a

16   little bit easier to read.

17             So from -- so I think you said the vast

18   majority of this is pulled from the records you

19   reviewed; is that correct?

20        A.    Yes.

21        Q.    Okay.   And this 13-page document, is this the

22   list of all of the prescriptions that were essentially

23   in paid status that Mr. Clough wrote for SUBSYS from the

24   records you reviewed?

25        A.    Yes.

1    Q.   Okay.  What was the date of the first one that

2    was written here?

3    A.   June 27th, 2013.

4    Q.   And is your entire spreadsheet -- I'm not

5    going to ask you to go through the whole thing now, but

6    is it sort of chronologically --

7    A.   Yes.

8    Q.   Okay.  And so as we go, just kind of to walk

9    the jury a little bit through what we're looking at

10   here, you referred a few minutes ago to the NDC.  What

11   is the column NDC?

12   A.   It stands for National Drug Code.  It's

13   basically just a numeric code.  The FDA keeps a listing

14   on their website.  It's just a code for a drug name and

15   strength to identify the exact drug.

16   Q.   And from that identifier, is that how you made

17   the far right-hand column, the strength?

18   A.   Yes.

19   Q.   And so -- just so that this is clear to the

20   jury, the NDC code 20482-002-30, what strength in

21   micrograms does that correspond to in SUBSYS?

22   A.   200 micrograms.

23   Q.   Okay.  You have a pharmacy name listed in all

24   these.  Was there a particular pharmacy where the bulk

25   of Mr. Clough's SUBSYS prescriptions were issued out of?

1        A.    Yes, Linden Care.

2        Q.    Okay.  Do you know through your knowledge of

3    the -- the case and investigation what Linden Care is?

4        A.    I just know that it's a pharmacy.

5              MR. ROMBEAU:  Okay.  And if I could have you

6    zoom in just on maybe the first half of the far right

7    column, strength.  That's good.

8        Q.    So when we look at strength here of various

9    doses, in the course of preparing your spreadsheet, did

10   you see a range of doses that Mr. Clough wrote the

11   SUBSYS drug for?

12       A.    Yes.

13       Q.    Okay.  And what was that total range?

14       A.    I believe it was from 100 micrograms to 1,600

15   micrograms.

16       Q.    Okay.  I want to ask you briefly about the

17   hundred micrograms.  We're looking at, what,

18   approximately the first 25 to 30 prescriptions he wrote

19   here that have been zoomed in on; is that correct?

20       A.    Yes.

21       Q.    Were there any hundred-microgram prescriptions

22   in that first batch?

23       A.    No.

24       Q.    Okay.  Were you able to make any observations

25   about Mr. Clough's writing of hundred-microgram

1    prescriptions?

2         A.    It was approximately the 99th prescription

3    that was the first time a 100-microgram prescription was

4    written and paid for.

5         Q.    Okay.  Let's see if we can find that one.  I

6    think it -- was that sometime approximately in September

7    of 2013, do you remember?

8         A.    I believe so.

9         Q.    Okay.  Well, it's going to be too small to

10   zoom in, but --

11        A.    It's in that group.  It's about in the middle

12   of that group.  There you go.

13        Q.    So from this massive chart, did you further

14   analyze this data in a summary table?

15        A.    Yes.

16              MR. ROMBEAU:  Okay.  Can we pull up 153, just

17   the first two -- that's the one with the first two

18   columns.

19              Yes.  Let's do the first two columns right now

20   so we'll get to everything else.

21        Q.    What are we looking at here in Exhibit 153?

22        A.    This is a summary of the number of

23   prescriptions Mr. Clough wrote and that were paid for by

24   month.

25        Q.    Okay.  So what was the grand total of

1    prescriptions?

2        A.    774.

3        Q.    Okay.  And so just to kind of walk us through

4    a little bit, when did he first start writing SUBSYS?

5        A.    June 2013.

6        Q.    Okay.  And how many prescriptions were there

7    from that month?

8        A.    Two.

9        Q.    Okay.  And then what happened in July of 2013?

10       A.    In July of 2013, there were 32 prescriptions.

11       Q.    Okay.  And then did those numbers continue to

12   go up?

13       A.    For several months, yes.

14       Q.    Okay.  And then it looks like in 2014 it

15   levels off somewhere in an average of 50 -- 50-something

16   a month; is that right?

17       A.    It appears so.

18       Q.    Okay.  And then drops off dramatically in the

19   fall of 2014?

20       A.    Yes.

21       Q.    Okay.  And, again, the data in this table,

22   does -- does that come from that larger spreadsheet we

23   just looked at?

24       A.    Yes.

25       Q.    You mentioned that part of your job as a

1    forensic accountant is to follow the money.  Did we also

2    ask you to do some more classic accountant-type work in

3    connection with this case?

4         A.   Yes.

5         Q.   Okay.  And what specifically did we ask you to

6    do about INSYS records related to Mr. Clough?

7         A.   I was asked to review payments from INSYS and

8    their related organizations and their contractors to

9    Mr. Clough.

10        Q.   Okay.  And what kind of records did you review

11   as this part of your tasks?

12        A.   I reviewed checks -- actual checks that were

13   cashed and also pay stubs.

14        Q.   Okay.  So if we could just ask you to give us

15   a brief overview and, generally speaking, what is the

16   life cycle of a check?  How does a check go from one

17   place to another?

18        A.   So a company like INSYS would write a check.

19   It would go to the person it was meant for.  So, in this

20   instance, Mr. Clough.

21             Mr. Clough has a couple of different ways to

22   get the money.  And so he can deposit it into his own

23   account, where it would take a few days, where his bank

24   would contact INSYS's bank and request the money from

25   them and they would deposit it into Mr. Clough's

1   account.

2          Mr. Clough could also deposit it into another

3   individual's account.  He could take it to a

4   check-cashing organization and they would just give him

5   the cash right then and there for it, or he could walk

6   into INSYS's bank and -- or, you know, the same bank and

7   request the money directly from their account.

8          Q.   So if I understand you then from what you

9   described, the -- does this require looking at more than

10  one bank account to understand the life cycle of a

11  check?

12         A.   Yes.

13         Q.   Okay.  And why look at -- at more than one

14  or --

15         A.   It's a way to make sure that you have all of

16  the payments, make sure that you see the whole group of

17  payments and what actually happened to it.

18          So if you look at just INSYS's bank records,

19  then you would only see -- you would see that, yes, the

20  check was cashed, but you may not be able to tell where

21  it was deposited.  And if you look at Mr. Clough's

22  account, you may not see all checks being deposited

23  because there are other ways that he could get the money

24  that does not require him to deposit it directly into

25  his account.

1    Q.    And as part of this review, generally

2    speaking, did you see checks that were made out to

3    Mr. Clough?

4    A.    Yes.

5    Q.    And did you review those in preparation for

6    your testimony here today?

7    A.    Yes.

8         MR. ROMBEAU:  Okay.  May I approach the

9    witness, your Honor?

10         THE COURT:  You may, throughout the

11   examination.

12         MR. ROMBEAU:  Thank you.

13   Q.    I'm going to show you what's been marked and

14   admitted as Exhibit 151.  Take a moment if you'd like to

15   look it over.

16         What are we looking at here in Exhibit 151?

17   A.    So these are copies of the checks from INSYS

18   Therapeutics as well as their contractor, Plan 365, to

19   Mr. Clough.  And some of these check images also contain

20   the check stub, which is additional information

21   contained with a check.

22         MR. ROMBEAU:  Can we pull up for the jury

23   Exhibit 151.

24   Q.    This is the electronic version of what you

25   have before you.  Approximately how many pages are in

1    the stack in front of you?  You can just estimate.

2         A.    Probably around a hundred, more than that.

3         Q.    Okay.  So you mentioned pay stub here.  Page 1

4    of 151, what are we looking at here?

5         A.    Okay.  So when a company frequently -- when

6    they write checks, in order for the person receiving the

7    check to understand what it was for and for the company

8    to have records for what it was for, they usually

9    contain an additional amount of information.

10            So the bottom half or bottom portion is the

11   check itself to Mr. Clough.  You know, typically you

12   would receive that and it's perforated and you just kind

13   of pull that off and deposit that.

14            The upper two-thirds includes additional

15   information regarding what the check payment was for.

16        Q.    So, for example, walk us through the entry

17   here on -- on page 1 of Exhibit 151.

18        A.    So the -- it appears the date of the check

19   is -- actually, I don't know if that's the date of the

20   check or the date of the invoice, but there is a comment

21   section that says ISP 11.4.13, which is in reference to

22   an INSYS speaker program which occurred on November 4th,

23   2013.  And that is to indicate to both INSYS and

24   Mr. Clough that that payment was for that speaker

25   program.

1      Q.   And for a number of the records that you've

2   reviewed in connection with this, were you able to

3   gather that -- that information essentially from the

4   comment lines?

5      A.   Yes.

6      Q.   Okay.  And were you able to compile all these

7   checks into a summary table?

8      A.   Yes.

9           MR. ROMBEAU:  Okay.  Can we pull up 150,

10  please, I think is the one.

11     Q.   So tell us what we're looking at here,

12  Ms. Horan.

13     A.   This is a table of all of the payments made by

14  INSYS or their contractor, Plan 365, to Mr. Clough with

15  details about the account that INSYS paid it out of as

16  well as the account Mr. Clough deposited into and the

17  payment comments.

18     Q.   All right.  Did you prepare this chart in

19  connection with this trial?

20     A.   I did.

21          MR. ROMBEAU:  Okay.  Why don't we zoom in on

22  just the first couple lines so we can explain in a

23  little greater detail to the jury what we're looking at

24  here.

25     Q.   So how did you -- how did you put this

1  together then?  We'll start with the first line, check

2  12522.

3      A.   So a check was written from INSYS Therapeutics

4  out of their Northern Trust Bank account ending 3595.

5  This check was written on September 5th, 2013, for a

6  thousand dollars.  I reviewed the bank records from --

7  both INSYS Therapeutics' bank records at Northern Trust

8  and then also the account it was deposited into, which

9  was Mr. Clough's Bank of America account ending in 2049

10  and he deposited it on September 16th, 2013.

11      Q.   Okay.  And these -- these bank records, are

12  these -- do you know from the course of the

13  investigation, do these records come directly from the

14  bank?

15      A.   Yes.

16      Q.   Okay.  And are they accompanied by a

17  certificate of authenticity from the bank?

18      A.   Yes.

19      Q.   Okay.  So the bulk of activity in -- let me

20  ask it this way.

21          Did Mr. Clough typically use his Bank of

22  America account that we see here on line 1?

23      A.   Yes.  The majority of the checks from INSYS to

24  Mr. Clough were deposited into this particular account.

25      Q.   Okay.  And -- but was it all of the checks?

1        A.   No.

2             MR. ROMBEAU:  Okay.  A couple things that I

3    want to highlight, if we could go to the -- the Darryl

4    Baker entry.

5        Q.   What are we looking at here?

6        A.   So the payment from Mr. Darryl Baker is a

7    little different.  It was a payment -- Darryl Baker

8    was an employee at INSYS Therapeutics and he made a

9    transaction through Mr. Clough's PayPal account in the

10   name of the Sharon Clough Foundation.  The name of the

11   account was the Sharon Clough Foundation.  Mr. Clough is

12   the one who managed this particular PayPal account.

13       Q.   And how do you know that?  Is that from

14   records from PayPal?

15       A.   Yes.

16       Q.   Okay.  And I know we talked about checks a

17   lot.  Is a PayPal transaction the same thing as a check?

18       A.    It's different.  So this particular

19   transaction, Mr. Darryl Baker transferred the money

20   using a credit card instead.  So it was a -- it was just

21   a credit card transaction transfer.

22       Q.   And was there another checking account also

23   associated with the Sharon Clough Foundation?

24       A.   Yes.

25             MR. ROMBEAU:  Okay.  Could we zoom in on those

1   three J.P.Morgan transactions?

2           Thank you.

3       Q.   Tell us about these.  Was this -- how did you

4   know this account was affiliated with Mr. Clough?

5       A.   The Bank of America records indicate that

6   Mr. Clough had control over this particular Sharon

7   Clough Foundation account.  And the checks were from

8   INSYS Therapeutics and they were written to Mr. Clough.

9   They just happened to be deposited into this Sharon

10  Clough Foundation account.

11      Q.   And at some point did INSYS appear to stop

12  issuing the checks directly and use some sort of

13  third-party vendor to do so?

14      A.   Yes.

15      Q.   Okay.  Tell us about that.  What company did

16  they use?

17      A.   It was a company called Plan 365.

18          MR. ROMBEAU:  Okay.  Can we zoom in just on

19  the Plan 365 entries at the bottom?  It's the First

20  Citizens one.

21      Q.   So tell us what we're looking at here.

22      A.   So Plan 365 was hired by INSYS to manage their

23  INSYS speaker program, you know, handling all of the

24  paperwork, ensuring that the practitioners were paid for

25  their programs.  So these checks were all paid out of

1    Plan 365's First Citizens account ending 1852.  They

2    also contained a memo line on the check which has this

3    long string of alphanumeric characters.

4         Q.   Okay.  Do you know what those mean?

5         A.   So through my review of records, I have

6    determined that the -- they're sort of some letters and

7    numbers towards the end of the code that indicate the

8    date of an INSYS speaker program.

9         Q.   And were you able to review or match that up

10   with other records connecting it to specific events?

11        A.   Yes.

12        Q.   Okay.  And I see on one of them there's -- you

13   have an unknown listed.  What does that mean?

14        A.   So that is a check from Plan 365 to

15   Mr. Clough, but I could not identify that check being

16   deposited into one of the accounts that Mr. Clough had

17   that I had records for.

18        Q.   Okay.  Were you at least able to confirm

19   whether or not that check was cashed?

20        A.   Yes.

21        Q.   Okay.  And was it?

22        A.   Yes.

23        Q.   Okay.  So added all up, what was the total

24   payments from all these records you reviewed to

25   Mr. Clough?

1        A.    $49,303.

2        Q.    Okay.  And I see that's sort of an odd number.

3    Do you notice a couple checks that were not in the sort

4    of the regular thousand-dollar increments?

5        A.    Yes, there were a few checks under 1,000.

6        Q.    What did those appear to be for?

7        A.    From my review of INSYS and -- INSYS records

8    and Mr. Clough's records, they appear to be expense

9    reimbursements.

10       Q.    Okay.  So we've got all these -- these checks

11   and speaker events you were able to identify.  Did you

12   add those to the table that we already touched on

13   briefly, I think it's 153?

14       A.    Yes.

15             MR. ROMBEAU:  Okay.  Can we zoom in on this a

16   little bit.

17       Q.    So with all the data together, can you tell us

18   what we're looking at here?

19       A.    Yes.  So this is just a summary of -- by

20   month.  As we discussed, the number of prescriptions

21   were summarized by month.  And then I also added a

22   column for the number of INSYS speaker programs per

23   month and the number of payments INSYS issued per month.

24       Q.    And so there's a lot of numbers there.  Did we

25   also ask you to prepare a chart showing all the -- this

1    interplay of data in a more visual fashion?

2         A.   Yes.

3              MR. ROMBEAU:  Okay.  Could we pull up 154,

4    please.

5              Oh, okay.  We're having a little system

6    problem, so we'll use this paper copy.

7              Thank you.

8         Q.   Okay.  Can you see what's on the screen in

9    front of you?

10        A.   Yes.

11        Q.   Okay.  What are we looking at here?

12        A.   This is a graph of the information that was in

13   the previous table.  It's accumulated instead of by

14   month by quarter.  So it's -- basically quarters are a

15   typical financial segment of time.  So it's -- you know,

16   January, February, March are the first quarter of the

17   year and so on.

18        Q.   We're back up in operation here.  We'll do it

19   digitally.

20        A.   There we go.

21        Q.   Okay.  So -- so -- we talked a little bit

22   about quarters in the course of this case, but how many

23   months are in a quarter?

24        A.   Three.

25        Q.   Okay.  And so when we look at quarter 2 of

1    2013, what are we looking at there?

2         A.    Mr. Clough wrote approximately two

3    prescriptions in the second quarter of 2013 and did not

4    do any INSYS speaker programs.

5         Q.    Okay.  And then how about when we get to the

6    next quarter, quarter 3 of 2013, about how many

7    prescriptions were there for that quarter?

8         A.    For the third quarter of 2013, there were

9    approximately 115 prescriptions.

10        Q.    Okay.  And did he start to have some speaking

11   events show up on the records you reviewed?

12        A.    Yes, there were two speaking events.

13        Q.    What about the next quarter, fourth quarter of

14   2013?

15        A.    So in the fourth quarter of 2013, there were

16   approximately 150 prescriptions written and ten INSYS

17   speaker programs.

18        Q.    Okay.  Did those -- both categories continue

19   to go up into the first quarter of 2014?

20        A.    Yes, they continued to increase to

21   approximately 170 prescriptions and I believe 13 INSYS

22   speaker programs in the first quarter of 2014.

23        Q.    And did Mr. Clough continue to have the

24   prescriptions come in in quarter 2 of 2014?

25        A.    In the second quarter 2014, there were again

1   approximately 170 prescriptions.

2        Q.   Okay.  And about how many speaking events?

3        A.   Approximately 11.

4        Q.   And then the -- the line appears to go in the

5   other direction.  What did you observe in the last few

6   quarters of 2014?

7        A.   In -- from quarter 3 to -- of 2014 and quarter

8   4 of 2014, both the number of prescriptions written and

9   paid -- written by Mr. Clough and then paid for and the

10  INSYS speaker programs decreased.

11            So in the third quarter there were

12  approximately 115 prescriptions and nine speak -- or

13  eight speaker programs.  In the fourth quarter there

14  were approximately 35 prescriptions and two speaker

15  programs.

16        Q.   And then did the speaker programs completely

17  stop?

18        A.   Yes.  There were no speaker programs in 2015.

19        Q.   So tell us about any trend lines you observed.

20  Obviously they're right in front of you, but what are we

21  looking at here?  Do these two categories move in

22  tandem?

23        A.   So I did not perform any statistical analysis,

24  but between the second quarter 2013 and the first

25  quarter 2014, so these two quarters, both of these

1    numbers were increasing.

2              In the second quarter of 2014, the

3    prescriptions stayed steady and the INSYS speaker

4    programs decreased.

5              And then for the remaining quarters or, excuse

6    me, from quarter 3, 2014 to quarter 1, 2015, the speaker

7    programs decreased as well as the prescriptions.

8              And as you can see, the final quarter in the

9    graph, the prescriptions increased a minor amount.

10        Q.    A minor amount.

11             MR. ROMBEAU:  I have nothing further, your

12   Honor.

13             THE COURT:  Cross-examination.

14             MR. RICHARD:  No questions, your Honor.  Thank

15   you.

16             THE COURT:  You're excused.

17             THE WITNESS:  Thank you very much.

18                    (Witness excused.)

19             MR. AFRAME:  The government calls Kevin Flynn.

20             THE COURT:  Please.

21             THE CLERK:  Good morning, sir.  If you'd like

22   to step this way, please.

23             Please step into the witness box and remain

24   standing.

25             Please raise your right hand.

1          **KEVIN FLYNN**, having been first duly sworn,

2    testified as follows:

3          THE CLERK:  For the record, please state your

4    full name and spell your last name.

5          THE WITNESS:  Kevin Michael Flynn, Jr.,

6    F-l-y-n-n.

7          THE CLERK:  Thank you.  Please be seated.

8                    DIRECT EXAMINATION

9    BY MR. AFRAME:

10       Q.   Good afternoon, Mr. Flynn.

11       A.   Good afternoon.

12       Q.   How old are you?

13       A.   49.

14       Q.   And where do you live?

15       A.   Somersworth, New Hampshire.

16       Q.   And are you married?

17       A.   I am.

18       Q.   And do you have children?

19       A.   I do.

20       Q.   What do you have?

21       A.   For children?

22       Q.   Yes.

23       A.   Triplet girls.

24       Q.   How old?

25       A.   13.

1    Q.    My condolences.

2          What's the highest level of education that you

3    obtained?

4    A.    I attended college, but ended up leaving with

5    a couple classes still left to take.

6    Q.    Okay.  And have you been in the workforce

7    since you almost finished college?

8    A.    Yes.

9    Q.    And can you just describe -- at some point did

10   you come work for INSYS?

11   A.    I did.

12   Q.    And we're going to get to that in a minute.

13   Can you just give the jury an overview of your pre-INSYS

14   career?

15   A.    Okay.  After -- after I left college, I worked

16   for a cleaning supply company, salesperson, covering

17   school districts, manufacturing plants, anyone that used

18   commercial cleaning equipment and supplies.

19         And I did that for a while and then I went to

20   work for a bigger company, Safety Shoes.  So safety

21   footwear.  I called on manufacturing plants, anyone

22   needed steel-toed shoes or slip-resistant footwear.

23         Then I went back to Arnold T. Clement, which

24   is a cleaning supply company, and brought some of my

25   knowledge back with working for a bigger company.  I did

1    that for a while.

2              And then 2013 is when I worked for INSYS

3    Therapeutics.

4         Q.   Okay.  And so that -- that whole preperiod is

5    all sales?

6         A.   All sales.

7         Q.   And where do you work now after INSYS?

8         A.   It's a company called Market Advantage Plus.

9         Q.   And is that sales, too?

10        A.   It is.

11        Q.   Okay.  Now, let's talk about how you became to

12   work for INSYS.

13             How did you -- what made you look for a job in

14   pharmaceutical sales?

15        A.   I was looking for another job and that was

16   something I had sent my resume on -- I don't know if it

17   was Indeed or something.

18        Q.   Okay.  So you just sent in a resume?

19        A.   Yes.

20        Q.   And tell me about the hiring process.

21        A.   I was called by someone in HR that wanted to

22   talk to me about my background, whatever, and then I

23   ended up getting an interview shortly after.

24        Q.   And who was it that interviewed you?

25        A.   Sunrise Lee and Jonathan Roper.

1      Q.   And where did that happen?

2      A.   Some hotel in Concord or Manchester, I forget.

3      Q.   Okay.  And did -- who did most of the talking

4  at that interview?

5      A.   I think Sunrise did a lot of it.

6      Q.   And did they explain to you the -- what the

7  job was?

8      A.   Yes.

9      Q.   What was -- what did you understand the job

10 was going to be?

11     A.   To call on pain offices and oncology offices

12 to promote our drug.

13     Q.   And what drug was that?

14     A.   SUBSYS.

15     Q.   And did you have any pharmaceutical sales

16 background at this point?

17     A.   No.

18     Q.   Did you tell them that in the interview?

19     A.   Yes.

20     Q.   And what was their reaction?

21     A.   They were -- they didn't really have one.  I

22 mean, they -- I just assumed that they were looking at

23 my sales background.  I didn't ...

24     Q.   And what did they tell you how you were going

25 to go about finding doctors to sell this drug to?

1    A.    There is a sales force or a call deck on an

2    iPad that we received and there was a list of people to

3    call on.

4    Q.    Now, when you heard about what the drug was,

5    did you think that you had a potential connection that

6    might be useful in trying to sell this drug?

7    A.    I had a friend that I went to high school with

8    that is a pain management physician, anesthesiologist.

9    Q.    And let me just ask a few questions about him.

10   What is his name?

11   A.    Dr. Alan Carignan.

12   Q.    And, again, tell me what kind of doctor he is.

13   A.    Anesthesiologist and pain management.

14   Q.    And where does he operate -- where does he

15   practice?

16   A.    Right now it's PainCare in Somersworth.

17   Q.    And at that time, where was he?

18   A.    Seacoast Pain Institute, also in Somersworth.

19   Q.    And do you know where that is in relationship

20   to where the defendant's pain clinic was?

21   A.    Same road, down the street.  I don't --

22   couldn't tell you how far, but ...

23   Q.    And he had a -- did you know if he had a

24   stable of pain patients?

25   A.    He did.  He was a partner, so -- and he worked

1    at the hospital, so he had a lot of them, I guess.

2         Q.    And how long had you known him again?

3         A.    High school.

4         Q.    And was that an ongoing friendship?

5         A.    Yes.  Once we were done school, we'd get

6    together for lunches and so forth.

7         Q.    And in the interview, did you bring up your

8    friendship with Dr. Carignan?

9         A.    Yes.

10        Q.    And did you think that this was going to be a

11   possible at least first step to finding a doctor?

12        A.    Yes, for sure.

13        Q.    Okay.  Did you talk to your friend about this

14   job?

15        A.    Before I took it, I talked to him about it,

16   yes.

17        Q.    Based on that information, what thoughts did

18   you have about the job?

19        A.    That it was going to be very difficult, a

20   niche product, and he said it's going to be hard to find

21   patients, but they are out there.

22        Q.    And what's the niche that he -- that you

23   understood this drug filled?

24        A.    Near end-of-life cancer patients.

25        Q.    And so when you understood this was going to

1    be hard, what did you decide to do?

2        A.    I liked getting a job in the pharmaceutical

3    world, so I took it.  I didn't -- you know, hard work

4    doesn't get in the way.

5        Q.    And once you came on board, did INSYS do any

6    more training?

7        A.    I had a week of reading.  They sent us a big

8    book to read for a whole week.  And then we went to

9    corporate for a week for in-classroom training.

10       Q.    And did you hear during that training the idea

11   of find your one doctor?

12       A.    Yes, that was the theme.

13       Q.    And did you -- what did you understand that to

14   mean?

15       A.    Go to the doctor's office a lot, get to know

16   them, find a doctor that will start writing the

17   medication for you.

18       Q.    And was there discussion out in Arizona about

19   the speaker program?

20       A.    Yes.

21       Q.    Was that a point of emphasis?

22       A.    It was.

23       Q.    What -- what did you think of -- what did you

24   come away from Arizona at least understanding about the

25   speaker program?

1    A.    That that is a way to increase your business,

2    that I need to find a speaker for -- to help my

3    business.

4    Q.    You had a friend.  Did you ask him if he

5    wanted to be a speaker?

6    A.    I did not.

7    Q.    Why not?

8    A.    Because he didn't have any patients on it, so

9    I wasn't going to broach that subject.

10    Q.    Okay.  And yet he had a practice of pain

11    patients?

12    A.    Yes.

13    Q.    But had no patients on SUBSYS?

14    A.    Eventually one, but not at that -- not at this

15    time that we're talking about.

16    Q.    Okay.  When you came out of the training,

17    what -- what area were you assigned?

18    A.    Basically Boston north, except for two

19    PainCare offices, one in Newington and one in

20    Somersworth.

21    Q.    And what were those places called, do you

22    know, the name of the place?

23    A.    PainCare.  I don't --

24    Q.    Yeah.

25    A.    Okay.

1       Q.    And do you know if -- who -- who was

2   covering -- why did you not get those?  You got all of

3   New Hampshire, but you didn't get PainCare.  Why not?

4       A.    Another salesperson, Natalie Levine, had a

5   relationship and they were writing the drug for her, so

6   she kept it.  She kept those two offices along with her

7   other territory.

8       Q.    And so as you came on board, you didn't have

9   PainCare.  Do you know if that's where the -- do you

10  know the defendant, Mr. Clough?  Have you ever met him?

11      A.    I've met him a couple times, a handful of

12  times.

13      Q.    And did you know if he worked at PainCare?

14      A.    Yes.

15      Q.    And you -- and so you didn't go there, but you

16  went all around the rest of New Hampshire?

17      A.    And Maine and Massachusetts, yes.

18      Q.    And did you have Vermont, too?

19      A.    I did, but they're not really allowed to see

20  sales reps, so I didn't spend a lot of time there.

21      Q.    Okay.  And what did you do as you -- as you

22  came on board and you didn't have Mr. Clough in your

23  territory because he was excluded, what did you do

24  instead?

25      A.    Went down the list on my iPad and started

1    visiting offices and making lunch appointments, seeing

2    how the offices -- each office is different on how they

3    see reps, so I had to start asking questions, you know.

4         Q.   How'd that go in the beginning?

5         A.   Not great.  I guess you could describe it at

6    that.  Just tough.

7         Q.   What problems were you running into?

8         A.   They did not have the patient population to

9    put a person on the drug.

10        Q.   And were you going to pain clinics?

11        A.   Yes.

12        Q.   Eventually, did you come at some point later

13   to actually -- after Ms. Levine, who we've already met

14   here, left, did you actually get PainCare as a place

15   that you were -- that you --

16        A.   When she resigned, whatever, I had them for a

17   couple months, sure.

18        Q.   So you know what's going on at PainCare,

19   right?

20        A.   Uh-huh.

21        Q.   Based on when you took it over later, right?

22        A.   Yes.

23        Q.   And you went around New Hampshire and you went

24   around Maine and you went to all these PainCare clinics,

25   right?

1        A.    Yes.

2        Q.    Did you notice anything different about what

3    was going on as far as patients and populations at those

4    places than at PainCare?

5        A.    Just the amount of people that were getting

6    prescriptions on the -- whoever was on the drug.

7        Q.    On SUBSYS?

8        A.    On SUBSYS.  Sorry.  Yes.

9        Q.    PainCare had a lot of people on SUBSYS, these

10   other places didn't?

11       A.    Correct.

12       Q.    We know that.  But how about anything else?

13   Did you notice any major differences between the kinds

14   of people that --

15       A.    There weren't a lot of MDs.  I found a lot of

16   MDs elsewhere, but not so much at PainCare.  But ...

17       Q.    Okay.  Now, your -- your friend, did you -- so

18   as you went around to those places, did you try to do

19   lunches?

20       A.    Yes, we could go to lunch every day -- I could

21   bring lunch to an office every day.  I didn't really

22   have a budget.  I could just go to lunch every day.

23       Q.    And were you doing that?

24       A.    As often as I could.

25       Q.    Did that lead to anything?

1    A.    Yes.   I started getting some attraction with

2  certain offices in a couple states.

3    Q.    And at the high point, how much were you

4  able -- what was your best quarter as far as scripts?

5    A.    The number of scripts, I might have had 10 or

6  12 patients.  So if they got three prescriptions each,

7  that would have been 36, if there was -- if they were

8  there through the whole quarter.  It didn't always work

9  like that.

10   Q.    So sometimes less?

11   A.    Sometimes less.

12   Q.    But 10 or 12 patients was the high water mark?

13   A.    Yeah.

14   Q.    And is that one prescriber or is that spread

15 over several prescribers?

16   A.    I had several offices that were writing the

17 drug for me.

18   Q.    And was each one doing it in a small amount?

19   A.    Yes.

20   Q.    How about your -- your friend?  Did he let you

21 do lunches at Seacoast Pain?

22   A.    Yes, whenever I wanted to come in.

23   Q.    And did you do that often?

24   A.    I did it a handful of times, yes.

25   Q.    Did your friend want you to succeed in the

1  job?

2       A.   Yes.

3       Q.   And did he let you -- and he let you do

4  lunches because of that?

5       A.   Yes.  I mean, he -- he always told me he only

6  sat down at lunch because I was there.  Usually he would

7  skip the rep lunches.

8       Q.   And how many scripts -- you told us there was

9  one, and I'll ask you about the one in a second.  Other

10  than that how many scripts did you get out of Seacoast

11  Pain Clinic?

12       A.   None.  Just the one.

13       Q.   How many did Dr. Carignan himself, your

14  friend, write for you?

15       A.   Just the one.

16       Q.   And tell me about that one.  What kind of

17  patient was that one?

18       A.   End-of-life cancer patient.

19       Q.   And how long into the job did you -- did

20  Dr. Carignan find you that one patient?

21       A.   I'm going to -- I guess about a year.

22       Q.   Now, you said in the beginning it was tough

23  and you -- you weren't really getting that many scripts.

24  Did Mr. Roper -- was Mr. Roper your boss?

25       A.   Yes, he was district manager.

1        Q.   Did he ask you to attend any kind of an event

2   with Natalie Levine?

3        A.   Just like a speaker program that I would see

4   what they're like.  I had never been at one, didn't know

5   what they were like.

6        Q.   And in January of 2014, did you go to a

7   speaking event at the Library in Portsmouth?

8        A.   I did.

9        Q.   And who was supposed to be the speaker at that

10  event?

11       A.   Chris Clough.

12       Q.   Was it in a private room or in the restaurant?

13       A.   Restaurant.

14       Q.   And who else was there, if you remember?  Was

15  Ms. Levine there?

16       A.   Natalie, Jessica, and I think some MAs or

17  something from PainCare.

18       Q.   Was there a presentation made by Mr. Clough

19  about the drug with the slide deck?

20       A.   No.

21       Q.   Was there any detailed discussion about the

22  drug during the dinner?

23       A.   No.

24       Q.   Now, you said -- again, we're back to your

25  friendship with Dr. Carignan.  Did you ever try to get

1    him to come to a dinner with -- where Mr. Clough was

2    going to be a speaker?

3         A.    I did.

4         Q.    Was that easy to get him to do or hard?

5         A.    It took some arm-twisting, but he came.

6         Q.    Okay.  And where was that?

7         A.    At a restaurant in Boston.

8         Q.    And what restaurant?

9         A.    Abe & Louie's.

10        Q.    Did you have kind of a deal about what you

11   needed to do if he was going to come?

12        A.    I had to drive him.

13        Q.    And why was that?

14        A.    Because he -- he didn't want to go.  So he

15   said if I drove, he would go.

16        Q.    Okay.  And did you go and have dinner?

17        A.    Yes.

18        Q.    And was Mr. Clough there?

19        A.    Yes.

20        Q.    And was there some discussion about the drug

21   with Dr. Carignan?

22        A.    Yes.

23        Q.    Was there a full presentation with the slide

24   deck?

25        A.    It would have been on an iPad or something,

1  but not like a screen or something.

2      Q.   And, again, was that -- where was that in

3  the -- was that in a private room or was that just in

4  the restaurant?

5      A.   At our table.

6      Q.   And was most of the time more of just a social

7  occasion?

8      A.   Yes.

9      Q.   And you said you eventually took over PainCare

10  when Natalie left, right?

11      A.   Yes.

12      Q.   When was that?

13      A.   Late 2014.  November, like October, something

14  like that.

15      Q.   So like fall or later?

16      A.   Yes.

17      Q.   And by that point -- that must have been

18  great; did -- Mr. Clough became one of your writers?

19      A.   Yes.

20      Q.   Did you make a ton of money off of that?

21      A.   I made a little for the couple of months.  The

22  patients were all off by December, but, yes, I made a

23  little bit of money off that.

24      Q.   So a little bit, but did you -- you just said

25  something about December.  What had happened by December

1    of 2014?

2         A.   The patients were coming off the drug.

3         Q.   And do you have any idea why that was?

4         A.   I do not.

5         Q.   Did your boss seem to know that was going to

6    happen?

7         A.   Yes.

8         Q.   Was there any -- did you ever use Mr. Clough

9    as a speaker?

10        A.   No.

11        Q.   Why not?

12        A.   Just something my friend Dr. Carignan told me

13   once.

14        Q.   Which is what?

15        A.   Oh, he just said he didn't -- he doesn't

16   want --

17             MR. RICHARD:  Objection, hearsay.

18             THE COURT:  Sustained, unless you can offer it

19   for something other than --

20             MR. AFRAME:  Yes.

21        Q.   But you never used Mr. Clough as a speaker?

22        A.   No.

23        Q.   And you never -- and you -- and he just

24   stopped writing -- when you took over, he was just -- he

25   just stopped writing the drug any longer?

1      A.   Yes.  At the end of my year was my

2  understanding, yes.

3      Q.   Okay.  And did you ever go and try to pressure

4  him to write -- to write more of it?

5      A.   No.  I was not -- I was not allowed to --

6      Q.   Okay.

7      A.   -- call on that office.

8           MR. AFRAME:  Okay.  Thank you.

9           THE COURT:  Cross?

10          MR. RICHARD:  Thank you.

11                      CROSS-EXAMINATION

12  BY MR. RICHARD:

13     Q.   Good afternoon, Mr. Flynn.

14     A.   Good afternoon.

15     Q.   Mr. Flynn, you said you attended a speaking

16  engagement at Abe & Louie's?

17     A.   Yes.

18     Q.   And that's in Boston?

19     A.   Yes.

20     Q.   Okay.  And you had to drive your friend

21  Dr. Carignan down?

22     A.   Yes.

23     Q.   Okay.  Because he didn't want to drive

24  himself?

25     A.   Yes.

```
1          Q.   All right.  Were you afraid he was going to
2    leave if you didn't drive him?
3          A.   No, He's just sort of -- that's just the way
4    he is.
5          Q.   Okay.  All right.  You said there was a --
6    there was a slide deck on an iPad there?
7          A.   Yes.
8          Q.   Okay.  And it wasn't shown for very long,
9    correct?
10         A.   However they go through them, but short amount
11   of time, sure.
12         Q.   Okay.  But Mr. Clough was there as the
13   speaker?
14         A.   Yes.
15         Q.   Okay.  And he actually showed a little bit of
16   what was on that slide deck?
17         A.   Correct, uh-huh.
18         Q.   But most of the time there was social,
19   correct?
20         A.   Yeah, I would classify that.
21         Q.   Okay.  And there was some discussion about the
22   drug?
23         A.   Correct.
24         Q.   Okay.  How long were you a salesperson for
25   SUBSYS?
```

1    A.    November of 2013 until January of 2017.

2    Q.    Did you quit the job or were you let go?

3    A.    Let go.

4    Q.    You got let go?

5    A.    Uh-huh.

6    Q.    Okay.  Okay.  Did you ever get a speaker?

7    A.    I did.

8    Q.    Okay.  And who did you get for a speaker?

9    A.    A woman named Kelly Defeo.

10   Q.    Okay.  And where does she work out of?

11   A.    I think she's in Berlin or was up in

12   North Conway at the time, but Berlin now, I think.

13   Q.    Okay.  What kind of a practice was she in?

14   A.    She was at a PainCare practice and then she

15   had her own and now she's at the hospital, I think.

16   Q.    Okay.  Did it belong -- you said a PainCare

17   practice.  Did it belong to PainCare --

18   A.    It was part of their --

19   Q.    Part of their group?

20   A.    Yes.

21   Q.    Okay.  So there's a PainCare in Somersworth,

22   right?

23   A.    Uh-huh.

24   Q.    A PainCare in Newington?

25   A.    Uh-huh.

1      Q.   And there's one up in Berlin?

2      A.   And Plymouth and -- there's a bunch, you know.

3      Q.   Oh, there are a whole bunch of them?

4      A.   There's a whole bunch of them.

5      Q.   Okay.  All right.  Now was Ms. Defeo, was she

6  a doctor?

7      A.   No.

8      Q.   Was she a PA?

9      A.   I think she's NP and CRNA, I think, are her --

10      Q.   Nurse practitioner?

11      A.   Right, and a nurse anesthetist, I think she is

12  also.

13      Q.   Okay.  Now, you received training at the

14  program in Arizona, correct?

15      A.   Yes.

16      Q.   And they told you how these programs were

17  supposed to -- speaking programs were supposed to be

18  done?

19      A.   Yes.

20      Q.   Okay.  Prior to that training, had you ever

21  done any type of work like this where you had a speaking

22  program?

23      A.   Not besides a sales presentation where I would

24  talk to someone, not like having someone else.

25      Q.   Okay.  In your other employments as a sales

1    rep, you never had to employ a speaking program?

2         A.    No.

3         Q.    So this was the first time you were ever

4    exposed to that?

5         A.    First time.

6         Q.    Okay.  And at the training program in Arizona,

7    they taught you what a proper speaking program was

8    supposed to be?

9         A.    Well, they didn't go over that a lot.  We had

10   a slide deck and our job was to sit back and let the

11   speaker talk, you know.  It wasn't our position to do

12   anything.

13        Q.    Did they tell you how to set up a program?

14        A.    Just get people -- invite the correct people

15   that were supposed to be there and get the restaurant

16   and go from there.

17        Q.    Okay.  And when you say correct people, what

18   do you mean?

19        A.    People that had something to do with writing

20   the drug, MA, the person prescribing, whoever.

21        Q.    Okay.  All right.  And you were supposed to

22   have it in a proper environment as well?

23        A.    Yes, restaurant.

24        Q.    In a restaurant?

25        A.    Uh-huh.

1      Q.   Okay.  All right.  Did they tell you where in

2   the restaurant?

3      A.   Not at that point, no.

4      Q.   Okay.  And this was in -- when did you get

5   trained?

6      A.   It would have been 2013, November.

7      Q.   It was in November.  Okay.

8      A.   That's when I started.

9      Q.   That's when you started.  Okay.  And they send

10  you right away to this program as soon as you get hired?

11     A.   A week of reading and then a week out to --

12  for training there.  And it's on the job, mostly, yes.

13     Q.   Okay.  All right.  So the program that you

14  went to at Abe & Louie's, you had to sign in yourself?

15     A.   Yes.

16     Q.   Okay.  And the other reps had to sign in as

17  well?

18     A.   Yes, there was a form.

19     Q.   And Natalie Levine was there?

20     A.   Yes.

21     Q.   Okay.  Were there other medical providers

22  other than Mr. Clough and Dr. Carignan?

23     A.   No.

24          MR. RICHARD:  Okay.  Could I have just one

25  minute, your Honor?

```
1              THE COURT:  Yes.
2              MR. RICHARD:  One last thing.
3        Q.    Who was your supervisor when you were there?
4        A.    My boss?
5        Q.    Yes.
6        A.    Jonathan Roper.
7        Q.    Okay.  He put a lot of pressure on you to make
8   more sales; isn't that correct?
9        A.    Yes.
10       Q.    Okay.  He would pressure you to find your one
11  speaker?
12       A.    Yes.
13       Q.    Okay.  And when did you first find your
14  speaker?
15       A.    Maybe 2014, late, or -- yeah, maybe late 2014.
16  I don't know the exact date.
17       Q.    All right.  And did he try to get you to
18  encourage that speaker to make -- write more scripts or
19  not get enough -- not get any more engagements?
20       A.    It was -- it was try to get as many programs
21  as I could muster up, sure.
22       Q.    Okay.  Was there discussion with your
23  supervisor about a return on investment?
24       A.    There was some emails to that effect, but we
25  never talked like that.  But there was some emails to
```

172

1    that effect.

2        Q.    Okay.  Were you push -- did you push

3    prescription writing on your speaker?

4        A.    No.

5        Q.    Okay.  And that was something that your

6    supervisors wanted you to do, correct?

7        A.    Yes.

8        Q.    The emails went out; no script, no pay, right?

9        A.    Similar verbiage.  I don't remember, but --

10   uh-huh.

11       Q.    Okay.  All right.  Why didn't you pressure

12   your speakers to write you more prescriptions?

13       A.    I just didn't feel that was the -- what I

14   should be doing or -- you know, they're the

15   professional.  I'm just there to promote the drug.  I

16   wasn't going to get in the middle of it.

17       Q.    You were more ethical than that?

18       A.    I like to think so.

19       Q.    Okay.  Your -- the emails coming from your

20   supervisors --

21       A.    Uh-huh.

22       Q.    -- did they come more and more often to put

23   more pressure on you to make more sales?

24       A.    The -- as -- as I got more patients or however

25   you want to -- yes, the more sales you got, the more

1   pressure you got.

2        Q.   All right.  Did it seem like they kept

3   encouraging you to do more and more unethical practices?

4        A.   The speaker programs and that type of emails.

5        Q.   Okay.  But it seemed that they were asking you

6   to be more unethical than you were comfortable with?

7        A.   Uh-huh.  Yes.

8             MR. RICHARD:  Okay.  All right.  Thank you.

9   Nothing further, your Honor.

10            THE COURT:  Redirect?

11                   REDIRECT EXAMINATION

12   BY MR. AFRAME:

13       Q.   Your speaker, who was that?

14       A.   Kelly Defeo.

15       Q.   And did you have her doing -- how many

16   programs do you think she did, roughly, for you over how

17   long?

18       A.   Two or three over the entire time.

19       Q.   And you stayed there a long time?

20       A.   Four years.  I mean 2000 -- late 2000 -- to

21   January, yeah.

22       Q.   And you said you were let go.  How about

23   Mr. Roper, when was he let go?

24       A.   Before -- well, so I was promoted in

25   January -- in 2015.  He was let go shortly after, maybe

1   the fall.

2       Q.   So despite all the pressure we just heard

3   about, you stayed there?

4       A.   Yes.

5       Q.   And you did it the way you thought was right?

6       A.   Yes.

7       Q.   And you continued to work?

8       A.   Yes.

9            MR. AFRAME:  Thank you.

10           THE COURT:  Recross.

11           MR. RICHARD:  Nothing, your Honor.  Thank you.

12           THE COURT:  Sir, you're excused.

13           THE WITNESS:  Thank you.

14                    (Witness excused.)

15           THE COURT:  We'll take the lunch break.  Why

16   don't we try to get back here by 1:30 and get the

17   afternoon started.

18           We're in recess.

19           THE CLERK:  Please rise for the jury.

20                    (Jury excused.)

21           THE COURT:  Anything for the Court?

22           MR. RICHARD:  No, your Honor.  Thank you.

23           THE COURT:  See you at 1:30.

24           MR. RICHARD:  Thank you.

25           (Lunch recess taken at 12:36 p.m.)

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate

transcription of the within proceedings, to the best of

my knowledge, skill, ability and belief.



Submitted: 1/7/19                  _Liza W Dubois_

                                   Liza Dubois, RMR, CRR
                                   Licensed Court Reporter No. 104
                                   State of New Hampshire