# **Exhibit 1** 5

Lauren Brinkley-Rubinstein, PhD
Assistant Professor
Department of Social Medicine
Center for Health Equity Research
University of North Carolina at Chapel Hill
Affiliated Faculty, The Center for Prisoner Health and Human Rights at the Miriam Hospital
(Brown University)

Prison settings amplify risk of COVID-19. This is primarily because social distancing is nearly impossible due to the built environment of many prison facilities (1). People who are incarcerated recreate and dine together, use shared bathrooms, and often sleep in dormitory-style housing. In addition to this, many facilities are crowded at baseline making it that much more difficult to maintain physical distance. People who are incarcerated are also more likely to suffer severely from COVID-19—11% of individuals who are incarcerated are over the age of 55 and on average people who are incarcerated have at least one chronic health condition (2). Age, therefore, has often been considered a major factor in decisions to release certain people in the context of the pandemic.

While the age that might qualify someone for release has varied across systems, there is evidence that individuals who are incarcerated age at faster rates than their community-dwelling counterparts, providing evidence for a more flexible and younger age to be considered for release qualification. For example, Williams, et al. (2012) found that among men and women incarcerated at the San Francisco County jail, who were on average aged 59, they had health indicators that were more typical of community-dwelling people who were 71.7 years old (3). Studies have also indicated that chronic stressors, like incarceration, can be embodied and cause biological changes to the body (4-10). These changes can include "wear and tear" on the regulatory systems to include the metabolic, inflammatory, nervous, cardiovascular, and sympathetic systems. Dysregulation of these systems can lead to structural and chemical changes

1

of the brain and, most important herein, a compromised immune system (6).  Therefore, there is emerging evidence that people who are incarcerated tend to display health characteristics of individuals in the community that are much older and that long-term chronic stress, such as that introduced by incarceration, can lead to a weakened immune system—both of which heighten risk of suffering from COVID-19 severely.

Given the inherent risks of carceral settings, certain strategies have emerged as important to prevent COVID-19 including reduction of population, robust testing efforts, and cohorting of individuals to limit exposure and increase the success of contact tracing if there is exposure to a positive case. However, these strategies have been underutilized in most prison settings. On average, prisons have only reduced their populations by 5%. Similarly, testing has been slow to scale up across the nation. The Federal Bureau of Prison, to date, is reporting having conducted 29,896 total tests among incarcerated people with 9,019 positive cases and 99 deaths as of July 17, 2020. Among staff who are often where exposure originates due to their community contact with COVID-19, there have been a total of 919 cases and 1 death. The test positivity rate among incarcerated people is 30%, which is far higher than is found in community settings. Test positivity that is so high underscores the need to release significant proportions of the population to prevent mass COVID-19 infection. While these data are important to begin understanding the impact of COVID-19 in the Federal Bureau of Prisons, it is also important to point out the lack of transparency and data errors that threaten the integrity of these data and make more opaque our ability to comprehend their implications. In certain facilities so little testing has been conducted that is impossible to understand the current or historical incidence of COVID-19, but evidence from other systems indicates that more tests equal more identification of cases. FMC-

2

Devens is a facility in which dangerously little is known relevant to data on COVID-19 in their facility.

**Conditions and Data from FMC-Devens**

The Camp at FMC-Devens is a dormitory style living facility in which it is very difficult to engage in social distancing. Inmates recreate and eat together and share common electronic stations that house computers and telephones. Facilities that have these types of built environments, as attested to above, are extreme amplifiers of risk and have been the sites of countless outbreaks across the country, especially when there is no long term testing and mitigation strategy in place. The adjacent figure shows tests



conducted in FMC-Devens compared to tests conducted in the Bureau of Prisons overall. The source of these data is the Federal Bureau of Prisons, which is reported daily. On June 15, 2020, the Federal Bureau of Prisons began reporting testing data (so any testing numbers before this date are unknown). In total, at FMC-Devens, as of July 17th, it appears that a majority of people incarcerated at have been given a COVID-19 test, which is a good first step. However, it is important to point out the discrepancies in the data reported. Total testing numbers should not ebb and flow. Tests conducted day over day should continually add and lead to an increase in

3

total testing numbers. As you can see in this figure, at FMC-Devens, the testing data are in some ways inexplicable. Testing numbers that bounce up and down over time give us reason to pause and question the validity of the data and make it hard to understand the impact of testing as a prevention tool in this facility in particular. In addition, if it is true that FMC-Devens has tested a majority of people who are incarcerated there, yet have no long term plan to repeatedly test staff and incarcerated people or test all new transfers or admissions then this is not an effective, long-term way to mitigate future COVID-19 outbreaks.

In the below figure the number of positive cases at FMC-Devens as reported by the



Inmates Reported Positive at Devens FMC

Federal Bureau of Prisons is shown. At their peak, the facility had close to 50 cases. However, again we have to view these data skeptically. Because the Federal Bureau of Prisons removes cases from the positive case count once they are considered "recovered", it is difficult to accurately discern the total incidence of COVID-19 in this facility. For instance, if 10 new cases were discovered, yet on the same day 11 people were considered to be recovered, then the positive case count could go down even though new cases were discovered. This makes it difficult to understand how many cumulative cases there may be in total. In addition, to testing and cases numbers, FMC-Devens is also reporting 2 inmate deaths.

Staff are also a major source of risk because their community exposures are the route for COVID-19 to enter correctional facilities.  At FMC-Devens currently there are 6 staff reported as "recovered", meaning they, at some point, reported being positive to COVID-19. There is no information given as to number of staff tested.

Unfortunately, the Federal Bureau of Prisons does not provide data for other information that would be helpful to gauge the risk of their facilities. For instance, how many people have been put in quarantine or medical isolation? What is the institution's capacity to house people in quarantine or medical isolation units as defined by the Centers for Disease Control and Prevention to mitigate spread? How many people have they released to home confinement in an effort to de-populate their facilities? The Federal Bureau of Prisons also provides some information relevant to their sanitation practices and their transfer practices but there is no available information for each facility. Therefore, given the dormitory-style and congregate-living environment and the lack of a long-term testing focused mitigation plan, the risk of contracting COVID-19 at FMC-Devens remains high.

### Conclusions

When it comes to disease transmission, jails and prisons are extreme amplifiers of COVID-19 risk and FMC-Devens is no different. Prisons house a large number of individuals in close quarters who on average have a greater burden of disease and age quicker than their non-incarcerated peers. The experience of incarceration itself contributes to long-term stress that can affect the body's functioning and immune response. It is, therefore, not surprising that there have been large outbreaks at Bureau of Prison facilities across the country that have not decreased their population to allow for social distancing. In late March, Attorney General Barr encouraged the greater use of home confinement in an effort to depopulate the Federal Bureau

of Prisons. To date, the Bureau of Prisons reports that 7,021 people have been released on home confinement, which is only about 4% of the more than 174,000 people in the bureau's custody. This small percent change in reduction of population is unlikely to increase the ability to engage in social distancing or decrease the likelihood of COVID-19 spread across their facilities.

Given the limited efforts at reduction of population, testing becomes increasingly important. While FMC-Devens has had a mass testing effort of incarcerated people, the Federal Bureau of Prisons has not articulated a long term testing plan as other state entities have (e.g. targeted testing of all new entrants, people with a known exposure, transfers). Without a long term plan, one time mass testing of incarcerated people only (and not staff) is useless to mitigate future spread of COVID-19.  Additionally, it is unknown what FMC-Devens's capacity is to engage in medical isolation and quarantine for exposed and positive cases. These facts in combination with the congregate living conditions at FMC-Devens wherein transmission of COVID-19 can occur rapidly as we have seen in similar facilities repeatedly over the last four months, underscore that the most important prevention tool that can be utilized is depopulation.

**References**

1. Nowotny, K., Bailey, Z., Omori, M., & **Brinkley-Rubinstein, L.** (2020). COVID-19 exposes need for progressive criminal justice reform. *American Journal of Public Health, 110*(7), 967-968. http://doi.org/10.2105/AJPH.2020.305707

2. McKillop M, Boucher A. Aging prison populations drive up costs. 2018. Available at: https://www.pewtrusts.org/en/research-and-analysis/articles/2018/02/20/aging-prison-populations-drive-up-costs. Accessed July 20, 2020.

3. Chodos AH, Ahalt C, Cenzer IS, Myers J, Goldenson J, Williams BA. Older jail inmates and community acute care use. *Am J Public Health*. 2014;104(9):1728-1733. doi:10.2105/AJPH.2014.301952

4. McEwen BS, Gianaros PJ. Central role of the brain in stress and adaptation: links to socioeconomic status, health, and disease. Ann N Y Acad Sci. 2010;1186:190–222 [PMC free article] [PubMed] [Google Scholar]

5. McEwen BS, Wingfield JC. What is in a name? Integrating homeostasis, allostasis and stress. Horm Behav. 2010;57(2):105–111 [PMC free article] [PubMed] [Google Scholar]

6. McEwen BS, Gianaros PJ. Stress- and allostasis-induced brain plasticity. Annu Rev Med. 2011;62:431–445 [PMC free article] [PubMed] [Google Scholar]

7. Seeman T, Gruenewald T, Karlamangla A, Sidney S, Liu K, McEwen B, Schwartz J. Modeling multisystem biological risk in young adults: the Coronary Artery Risk Development in Young Adults Study. Am J Hum Biol. 2010;22(4):463–472 [PMC free article] [PubMed] [Google Scholar]

8. Seeman TE, Singer BH, Rowe JW, Horwitz RI, McEwen BS. Price of adaptation—allostatic load and its health consequences. MacArthur studies of successful aging. Arch Intern Med. 1997;157(19):2259–2268 [PubMed] [Google Scholar]

9.  McEwen BS, Stellar E. Stress and the individual. Mechanisms leading to disease. Arch
Intern Med. 1993;153(18):2093–2001 [PubMed] [Google Scholar]

10. Purtle J. (2013). Felon disenfranchisement in the United States: a health equity
perspective. *American journal of public health*, *103*(4), 632–637.
https://doi.org/10.2105/AJPH.2012.300933

Signed:

Lauren Brinkley-Rubinstein, PhD
Assistant Professor
Department of Social Medicine
Center for Health Equity Research
University of North Carolina at Chapel Hill
333 S. Columbia Street
341 MacNider Hall
Chapel Hill, NC 27559